244 F.3d 144 (D.C. Cir. 2001)
 Center for Auto Safety, Appellant
v.
National Highway Traffic Safety Administration, et al., Appellees
 No. 00-5128
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued February 6, 2001
Decided March 30, 2001
 
 Appeal from the United States District Court for the District of Columbia (No. 99cv01759)
 Allison M. Zieve argued the cause for appellant. With her on the briefs was Michael Tankersley.
 Lisa S. Goldfluss, Assistant United States Attorney, argued the cause for appellee National Highway Traffic Safety Administration. With her on the brief were Wilma A. Lewis, United States Attorney, R. Craig Lawrence, Assistant United States Attorney, Lloyd S. Guerci, Assistant Chief Counsel for Litigation, National Highway Traffic Safety Administration, and Enid Rubenstein, Attorney.
 Erika Z. Jones argued the cause for appellees Volvo Cars of North America, Inc., et al. With her on the brief were Adam C. Sloane, Karen L. Manos, Paul Jackson Rice, Christopher H. Grigorian, Scott T. Kragie, and Andrew W. Cohen.
 Before: Edwards, Chief Judge, Ginsburg and Tatel, Circuit Judges.
 Opinion for the Court filed by Chief Judge Edwards.
 Edwards, Chief Judge:
 
 
 1
 In December 1997, the National Highway Traffic Safety Administration ("NHTSA") issued an Information Request to nine airbag manufacturers and importers seeking information on airbag systems used in years 1990-98. Subsequently, the Center for Auto Safety ("Center") sought access to the information pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (1994). NHTSA released some of the information to the Center, but asserted that the remaining submissions were protected from disclosure under Exemption 4 of FOIA, 5 U.S.C. § 552(b)(4) (1994), which excludes from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential."
 
 
 2
 The Center filed suit in District Court, asserting that the disputed documents were subject to disclosure under FOIA, because the submissions to the Government had been mandatory and disclosure of the information would not cause impairment to the Government or substantial competitive harm to the respondents. The Center also submitted evidence purporting to demonstrate that the intervenor-defendants had customarily disclosed information of the same type at issue here.
 
 
 3
 On summary judgment, the District Court found that, because NHTSA's Information Request violated the Paperwork Reduction Act, 44 U.S.C. § 3501 (1994), NHTSA had no authority to enforce the request, and as a result the submissions should be considered voluntary. Center for Auto Safety v. Nat'l Highway Traffic Safety Admin., 93 F.Supp.2d 1, 16-17 (D.D.C. Feb. 28, 2000) ("Mem. Op."). The District Court found that some of the disputed documents qualified as trade secrets, and therefore were protected as such from disclosure. Analyzing the remaining information as voluntary submissions, the District Court evaluated the submissions under the standards laid out in Critical Mass Energy Project v. Nuclear Regulatory Commission, 975 F.2d 871 (D.C. Cir. 1992), and Niagara Mohawk Power Corp. v. United States Department of Energy, 169 F.3d 16 (D.C. Cir. 1999). Pursuant to Critical Mass, the District Court considered whether, in the past, the manufacturers and importers had customarily disclosed the same type of information at issue here, and determined that they had not.
 
 
 4
 We agree with the District Court that, because NHTSA violated the Paperwork Reduction Act, the agency's Information Request was not enforceable. Accordingly, because NHTSA lacked legal authority to enforce its request for information, the submissions cannot be considered mandatory even if the parties reasonably believed the Information Requests were mandatory at the time of submission. When an agency obtains information from private entities by asserting legal authority which it cannot enforce, private-party submissions are entitled to the same protection from disclosure as voluntary submissions.
 
 
 5
 Although the District Court appropriately analyzed disclosure under the voluntary, rather than mandatory standard, we find that the District Court misstated the appropriate legal standard. In addressing customary disclosure, the trial court appeared to indicate that the Center was required to prove that intervenor-defendants have previously released identical information. This is not a correct statement of the law. As a result, questions remain as to whether certain of the disputed information must be released because it has been customarily disclosed in the past. Accordingly, we remand the case to the District Court for further proceedings consistent with the opinion.
 
 I. Background
 
 6
 This controversy dates back to December 17, 1997, when NHTSA issued an Information Request to nine airbag manufacturers and importers: DaimlerChrysler Corporation, Ford Motor Company, General Motors Corporation, American Honda Motor Company, Mercedes-Benz USA, Nissan North America, Toyota Technical Center USA, Volkswagen of America, and Volvo Cars of North America. The companies were directed to respond by February 17, 1998, and NHTSA subsequently posted some of the information on the agency's website. Mem. Op. at 2. On January 19, 1999, the Center submitted a FOIA request for all material the agency had received but not yet made public. On February 16, 1999, NHTSA responded that Exemption 4 of FOIA barred disclosure of the disputed information. On March 10, 1999, the Center appealed NHTSA's decision. Id. at 3. On June 18, 1999, NHTSA granted the appeal in part, and then released some, but not all, of the disputed information. The Center filed the underlying FOIA suit on June 29, 1999. Subsequent to the filing, NHTSA released additional information. There are now 33 items of information remaining in dispute. Id. The items fall into six general categories, including airbag deployment, airbag cover, airbag system components, seatbelts, crash sensors, and system performance.
 
 
 7
 The District Court determined that NHTSA did not have to disclose any of the 33 items of information. The District Court found that 10 of the information items were protected from disclosure as trade secrets, including information regarding the tear pattern of the airbag, the fold pattern of the airbag, the number and location of the tethers, the type of inflator and gas generant, the number of inflation stages, the various tank tests used to measure inflator characteristics, and the engineering specifications provided to suppliers for development of algorithms. Id. at 14-15. The District Court explained that the remaining 23 information items were exempt from disclosure because the information was voluntarily submitted and constituted confidential commercial information that was not customarily disclosed. The District Court concluded that the information at issue had been disclosed in the past only when necessary, and always with a confidentiality agreement or protective order. Id. at 17-18.
 
 
 8
 The Center argued that the information was customarily disclosed, because most of the information could be ascertained through physical inspection. The District Court rejected this claim; the time, expense and risk of gathering the relevant information are substantial, and simply selling a vehicle to the public does not constitute revealing the detailed physical characteristics of airbags. Id. at 14-15.
 
 
 9
 The Center also argued that the manufacturers had previously disclosed the same type of information, and submitted extensive, detailed evidence to the District Court of prior instances of disclosure. The District Court rejected this claim as well, and concluded that, in each instance highlighted by the Center, the evidence indicated only discrete disclosures to entities requiring the information, not customary disclosure. Furthermore, the information disclosed was general and merely approximated the information submitted to NHTSA. Id. at 18. In addition, the District Court held that the Center failed to show that the previously disclosed information was the same type of information that the Center now seeks. On this latter point, the District Court noted that the Center "must" demonstrate that the information is "identical." Id. Based on this analysis, the District Court granted NHTSA's and intervenor-defendants' motion for summary judgment. We review the District Court's grant of summary judgment de novo. Rockwell Int'l Corp. v. United States Dep't of Justice, 235 F.3d 598, 602 (D.C. Cir. 2000).
 
 II. Analysis
 A. Voluntary or Mandatory Submissions
 
 10
 FOIA expresses a fundamental commitment to full agency disclosure of government documents. Public access, not secrecy, is the main purpose of FOIA. United States Dep't of Defense v. Fed. Lab. Relations Auth., 510 U.S. 487, 494 (1994) (quoting Department of Air Force v. Rose, 425 U.S. 352, 361 (1976)). Although FOIA is intended to expose agency action to public scrutiny, FOIA permits an agency to withhold information if it falls within any one of nine categories of exempted material. McCutchen v. United States Dep't of Health and Human Services, 30 F.3d 183, 184 (D.C. Cir. 1994).
 
 
 11
 NHTSA asserted that the information requested by the Center was protected from disclosure under Exemption 4, which excludes "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). This court has on a number of occasions addressed the standards governing determinations of whether information qualifies under Exemption 4. The judgment of the court sitting en banc in Critical Mass is our most significant statement on the subject.
 
 
 12
 In Critical Mass, the court held that material may be withheld as "financial or commercial" information under Exemption 4 of FOIA under two circumstances. First, "financial or commercial information provided to the Government on a voluntary basis is 'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." 975 F.2d at 879 (emphasis added). Second, financial or commercial information provided to the Government on a mandatory basis is "confidential" if "disclosure would be likely either '(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.' " Id. at 878. "[W]hen dealing with a FOIA request for information the provider is required to supply, the governmental impact inquiry will focus on the possible effect of disclosure on its quality." Id.
 
 
 13
 The decision in Critical Mass explains that, with respect to information voluntarily submitted, the party opposing disclosure bears the burden of proving the information is confidential. Id. at 879. In addition, in assessing customary disclosure, the court will consider how the particular party customarily treats the information, not how the industry as a whole treats the information. Id. at 872, 878-80. A party can voluntarily make protected disclosures of information, and as long as the disclosures are not made to the general public, such disclosures do not constitute customary disclosures. Id. at 874, 880.
 
 
 14
 The court further noted that disclosure under FOIA balances the public's interest in maintaining "an informed citizenry, vital to the functioning of a democratic society," with the Government's interest in access to data in making "intelligent well informed decisions," and private interests in protection from the "competitive disadvantages" that would result from disclosure. Id. at 872-73 (citations omitted). When the Government obtains information as part of a mandatory submission, the Government's access to the information normally is not seriously threatened by disclosure; the private interest is the principal factor tending against disclosure, and the harm to the private interest must be significant to prevent public access to information. Id. at 878. However, when the Government receives information voluntarily, it has a strong interest in ensuring continued access, and therefore both the Government and private interests weigh against overly broad disclosure. Id.
 
 
 15
 With this framework in mind, we agree with the District Court that the submissions in this case should not be treated as mandatory. At the same time, we note that this case does not involve a typical voluntary information submission--it involves a mistaken submission. NHTSA's request for information appeared mandatory on its face. The Information Request stated that "NHTSA hereby requires" the recipient to submit the information and explained that the recipient, "must respond to the enclosed Information Request." Information Request, reprinted in Joint Appendix ("J.A.") 323. Furthermore, the Information Request explained, "[f]ailure to respond promptly and fully to this Information Request could subject [recipient] to civil penalties pursuant to 49 U.S.C. § 30165 or lead to an action for injunctive relief pursuant to 49 U.S.C. § 30163." Id. The language of the Information Request clearly communicates to the recipient that submission of material was mandatory.
 
 
 16
 Nevertheless, NHTSA's request was not enforceable as a result of the Paperwork Reduction Act and, therefore, we find that the submissions cannot be considered mandatory. Under the Paperwork Reduction Act, if NHTSA seeks to collect information from 10 or more persons or entities, NHTSA must obtain prior approval from OMB. 44 U.S.C. § 3502(3)(A)(i) (Supp. IV 1998). If NHTSA fails to obtain prior approval from OMB, the request for information can be ignored without penalty. 44 U.S.C. § 3512(a) (Supp. IV 1998). OMB regulations specifically explain that "10 or more" includes any "independent entities to which the initial addressee may reasonably be expected to transmit the collection of information." 5 C.F.R. § 1320.3(c)(4) (2000).
 
 
 17
 On the record at hand, it is clear that NHTSA expected that the Information Request would be submitted to 10 or more entities. For example, the District Court pointed out that Volkswagen of America, as an importer, had to submit the Information Request to Volkswagen AG and Audi AG in order to respond to the questions, and all nine manufacturers who received the Information Request had to collect information from their suppliers. Mem. Op. at 36. This finding was also supported by the declaration of the executive director of NHTSA, L. Robert Shelton, who explained that NHTSA expected the recipients to send the request to their foreign parents, subsidiaries and affiliates. Declaration of L. Robert Shelton, reprinted in J.A. 463-65.
 
 
 18
 Although NHTSA expected that the Information Request would be submitted to 10 or more entities, NHTSA did not get prior approval from OMB. As a result, NHTSA had no authority to enforce the information request. Had the intervenor-defendants ignored the agency's request for information, NHTSA could not have compelled them to respond to the request. Because NHTSA could not enforce its Information Request, the material submitted in response to the Information Request cannot be considered mandatory.
 
 
 19
 In determining that the submission was not mandatory, we hold that actual legal authority, rather than parties' beliefs or intentions, governs judicial assessments of the character of
 
 
 20
 submissions. We reject the argument that, in assessing submissions for the purpose of Exemption 4 analysis, we should look to subjective factors, such as whether the respondents believed that the Information Request was voluntary, or whether the agency, at the time it issued the request for information, considered the request to be mandatory. Focusing on parties' intentions, for purposes of analyzing submissions under Exemption 4, would cause the court to engage in spurious inquiries into the mind. On the other hand, linking enforceability and mandatory submissions creates an objective test; regardless of what the parties thought or intended, if an agency has no authority to enforce an information request, submissions are not mandatory.
 
 
 21
 In distinguishing between voluntary and mandatory submissions, the court in Critical Mass emphasized that the Supreme Court has favored "the development of categorical rules whenever a particular set of facts will lead to a generally predictable application of FOIA." Critical Mass, 975 F.2d at 879 (discussing United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 779 (1989)). We also noted the Court's suggestion of a "practical approach" in interpreting FOIA, and defended the voluntary versus mandatory distinction as an objective test. Critical Mass, 975 F.2d at 879 (quoting John Doe Agency v. John Doe Corp., 493 U.S. 146, 157 (1989)). The distinction between voluntary and mandatory submissions that was delineated in Critical Mass was rooted in the importance of establishing clear tests in interpreting FOIA, and we continue in that tradition today.
 
 
 22
 We cannot accept the Center's argument that if recipients do not assert that a submission is voluntary before submitting information in response to an agency's request, they have implicitly waived their entitlement to subsequently assert that the submission was not mandatory. Critical Mass emphasizes our concern with an agency's "continuing ability to secure ... data on a cooperative basis." Critical Mass, 975 F.2d at 879. Although NHTSA in this case purported to seek data pursuant to its statutory mandate, the response by the manufacturers was certainly "cooperative" in the sense that they readily supplied the data without making legal objections. Indeed, at least two of the manufacturers acquiesced while maintaining that their responses were voluntary. Surely there is an important policy interest in minimizing resistance by a manufacturer to an agency's request for information; insisting that a respondent identify and air legal objections in response to any request in order to preserve its rights would tend to frustrate the "cooperati[on]" that Critical Mass values. Beyond, that it would needlessly waste resources to require that respondents identify legal defects that have no practical bearing unless and until a FOIA dispute materializes.
 
 
 23
 The Center also argues that intervenor-defendants have waived their entitlement to assert a claim under the Paperwork Reduction Act because claims under the Paperwork Reduction Act cannot be raised once the information is submitted. Permitting a party to raise a Paperwork Reduction Act claim after having submitted information to an agency does not support the purpose of the Paperwork Reduction Act; after information is submitted, the Paperwork Reduction Act's goal of reducing paperwork by mandating OMB review is moot. We disagree.
 
 
 24
 The Paperwork Reduction Act directly addresses when a claim can be raised. Although it does not expressly refer to claims arising after submission of the information, the statute provides that "[t]he protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto." 44 U.S.C. § 3512(b) (Supp. IV 1998). In Saco River Cellular, Inc. v. FCC, 133 F.3d 25, 31 (D.C. Cir. 1998), we explained that, by explicitly allowing parties to raise a Paperwork Reduction Act claim at any time during ongoing proceedings, the Paperwork Reduction Act "prevents an agency or court from refusing to consider a [Paperwork Reduction Act] argument on the ground that it is untimely."
 
 
 25
 Saco River is not directly on point, as it involved a Paperwork Reduction Act defense that was raised when the party had not submitted the information. However, the expansive language of the Paperwork Reduction Act itself, along with this court's explication in Saco River, militates against the Center's position and supports our finding that a Paperwork Reduction Act claim can be raised after information has been submitted. In addition, the Center's argument ignores the deterrence effect that permitting parties to raise their Paperwork Reduction Act claim can have on future agency actions. Although the paperwork may already have been produced in response to the particular Information Request, permitting parties to raise their Paperwork Reduction Act claim, even after submitting the information, further encourages agencies to comply prospectively with the Paperwork Reduction Act.
 
 B. Customary Disclosure
 
 26
 If this were an ordinary FOIA case involving the invocation of Exemption 4 with respect to information that had been voluntarily submitted to the Government, we would consider whether the information at issue has been customarily disclosed. Here, however, we are confronted with information that was submitted under false pretenses. That is, the Government claimed that it had the authority to compel the submission of the information when in fact no such authority existed. As noted above, applications of Exemption 4 attempt to balance private interests in protection from disclosure, governmental interests in access to data, and public interest in transparent governmental decision-making. In this case, the agency essentially "flashed its badge" to gain entrance to a private sphere when it had no legal authority to do so, and this misrepresentation must tip the balance of interests in favor of the private parties. Given this unusual situation-i.e., submissions made under false pretenses--we cannot treat the submissions as "mandatory." As a result, we apply the same standard we use in evaluating voluntary submissions. Thus, treating the information as having been submitted voluntarily, we turn to the question of whether the information is customarily disclosed.
 
 
 27
 As a preliminary matter, we note that the District Court found that 10 information items involved protected trade secrets. We have defined a trade secret as a "secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." Pub. Citizen Health Research Group v. FDA, 704 F.2d 1280, 1288 (D.C. Cir. 1983). On appeal, the Center argues that the information at issue addressed the physical and performance characteristics of airbags, not how airbags are manufactured, and, therefore, the information cannot qualify as trade secrets. Intervenor-defendants defend the trade secrets ruling. NHTSA does not defend the trade secrets ruling and instead urges the court to find that the submissions were voluntary and involved commercial information not customarily disclosed to the public. We agree with the Center that the information at issue does not qualify as trade secrets, but also agree with NHTSA that the information may nonetheless qualify for protection under Critical Mass. Our Decision in Public Citizen narrowly cabins trade secrets to information relating to the "productive process" itself, see id. at 1288; yet these 10 categories of information relate only to the end product--what features an airbag has and how it performs-rather than to the production process, how an airbag is made. To be sure, the manufacturers persuasively argue that the information is valuable to competitors and not readily obtained. That, however, goes to whether the information is customarily disclosed. Therefore, the question to be decided here is whether the information is independently protected under Critical Mass. We therefore turn to that issue.
 
 
 28
 The Center asserts that with respect to 18 of the 33 disputed items of information, at least one of the companies has customarily disclosed the same type of information in the past. The Center also claims that, because the information at issue relates to products that are sold on the public market, most of the information can be ascertained by examining an airbag, performing a routine test, or watching a publicly accessible videotape.
 
 
 29
 We reject the Center's argument that the mere selling of a product on the open market can constitute evidence of customary disclosure. The District Court correctly determined that the fact that intervenor-defendants sold cars with airbags to the public does not constitute evidence of customary disclosure. The District Court explained that dismantling airbags is "dangerous, time-consuming and expensive," and the information at issue in this case cannot be discovered simply by looking inside a car or taking apart a steering column or dashboard. Mem. Op. at 32. We agree--indeed, to find otherwise would so dilute the meaning of customary disclosure, as to render the requirement meaningless. The Information Requests specified that respondents must submit information for each vehicle, make, and model manufactured or imported into the United States between 1990 and 1998. Information Request, reprinted in J.A. 328. The fact that airbags can be bought on the open market and inspected certainly does not establish that information describing the physical characteristics of every vehicle produced over many years is customarily disclosed.
 
 
 30
 Although we agree that the mere sale of a product to the public does not constitute customary disclosure, there is one aspect of the District Court's opinion that is flawed. In Niagara Mohawk, this court held that information must be disclosed if identical information is in the public domain. "[I]f identical information is truly public, then enforcement of an exemption cannot fulfill its purposes." Niagara Mohawk, 169 F.3d at 19. The "identical information" basis for disclosure is, however, entirely distinct from the "customary disclosure" standard. Under the former test, the party favoring disclosure has the burden of demonstrating that the information sought is identical to information already publicly available; under the latter test, the burden is on the party opposing disclosure to prove that the information is of a kind that would customarily not be released to the public. Critical Mass, 975 F.3d at 879. In this case, the District Court appeared to hold that the Center could obtain release of the information only if information of that kind is customarily disclosed and the identical information has been disclosed. Mem. Op. at 39. This is not a correct statement of the law.
 
 
 31
 Despite this legal error, the District Court correctly rejected much of the Center's purported evidence of customary disclosure. The Center contends that customary disclosure is shown by the fact that many of the submissions to NHTSA had nothing more than detail to distinguish them from materials previously disclosed by the respondents. In other words, the Center argues that a difference in level of detail is inadequate to establish a difference in type of information. This argument is unpersuasive. In truth, substantial differences in level of detail can produce a difference in type of information. Thus, for example, a one time disclosure of information regarding a single model in a particular year will not likely create a genuine issue of material fact regarding the customary disclosure of multi-year, multi-model information.
 
 
 32
 The fallacy of the Center's claim is manifest even in the evidence that the Center itself highlights. The Center cites a declaration by Tamio Arakawa as evidence that Toyota customarily disclosed information which Center now seeks. Arakawa explained,
 
 
 33
 The information contained in [Center for Auto Safety's exhibit] is general information for a generic 1993-94 Toyota vehicle. Unlike the information contained in Toyota's response to NHTSA's information request, [Center for Auto Safety's exhibit] does not contain specific data for particular Toyota vehicles or for model years 1990-98. For example, the information described in [plaintiff's exhibit] regarding sensor and deployment thresholds is limited to head-on collisions. Deployment thresholds are not determined by only head-on collision data. The information that Toyota is seeking to protect from disclosure in this litigation include threshold values for various types of collisions for every 1990-98 Toyota Vehicle.
 
 
 34
 Arakawa Supp. 8, reprinted in J.A. 574-75. Contrary to the Center's assumptions, it was eminently reasonable for the District Court to conclude that the differences described by Arakawa show that the difference between the disclosed information and the submitted information is a difference in type. The Center pointed to information Toyota disclosed regarding a generic 1993-94 Toyota vehicle; the information at issue covers data for every 1990-98 Toyota vehicle. The former is not evidence of customary disclosure of the latter.
 
 
 35
 In sum, most of the District Court's findings on customary disclosure are supported by the record and consistent with applicable law. However, as a result of the District Court's misapplication of the Niagara Mohawk legal standard, some questions still remain regarding whether the intervenordefendants customarily disclosed certain information at issue. For example, the Center submitted evidence that "GM publicly disclosed a chart listing, by vehicle model for MY 19931996, the driver and passenger airbag material and weave." Appendix A, reprinted in J.A. 337. At oral argument, counsel for intervenor-defendants was unable to explain why this multi-year, multi-model information should not constitute evidence of customary disclosure. Following argument counsel submitted a letter to the court pointing to the supplemental declaration of C. Thomas Terry in response. Terry's supplemental declaration asserted that GM's release of information did not reflect a policy of customary disclosure of the type of information GM provided in response to the Information Request. According to Terry, the comments were an "isolated release of information" and differed in "specificity, measurement criteria, and other material respects." Supplemental Declaration of C. Thomas Terry, reprinted in J.A. 505, p 4, 507, p 14. Aside from these general claims, Terry presented nothing concrete to support this position. Furthermore, Terry noted that "[a]ny information in the comments that was identical to specific responses to the Information Requests has been disclosed." Id. at 505, p 4. As we have explained, however, the information need not have been identical to constitute customary disclosure.
 
 
 36
 Applying the appropriate legal standard on remand, the District Court must determine whether Terry's declaration, and any other relevant responses by intervenor-defendants, are adequate to defeat any claim of customary disclosure. The same inquiry must be made with respect to the 10 information items the District Court held were trade secrets and any other information item that is questionable due to the District Court's error in applying Niagara Mohawk. On remand, the District Court need not retry the entire case, for, as we have noted, most of the findings at issue easily survive challenge. It will be up to the Center to identify any other disputed material, like the aforecited material discussed in the Terry Declaration, that may have been analyzed pursuant to an incorrect legal standard by virtue of the District Court's flawed application of Niagara Mohawk.
 
 III. Conclusion
 
 37
 Based on the foregoing analysis, the case is remanded to the District Court for further proceedings consistent with this opinion.