**Carol M. PARKER, Plaintiff,**

v.

**BUREAU OF LAND MANAGEMENT, et al., Defendants,**

**and**

**Williams Pipeline Company and Equilon Pipeline Company, Defendant–Intervenors.**

**Melvin Goldstein, Plaintiff,**

v.

**Bureau of Land Management, et al., Defendants,**

**and**

**Williams Pipeline Company and Equilon Pipeline Company, Defendant–Intervenors.**

**Nos. CIV.A. 00–2621 ESH, CIV.A. 00–2873 ESH.**

United States District Court, District of Columbia.

April 12, 2001.

Charles Rickey Claxton, Claxton, Sale & Quinn, P.C., Washington, DC, for Plaintiff.

Madelyn Elise Johnson, U.S. Attorney's Office, Washington, DC, Catherine R. Lewers, U.S. Dept. of Justice Environmental Division, Washington, DC, John Frederic Shepherd, Robert T. Connery, Holland & Hart, Denver, CO, Melvin Goldstein, Goldstein & Associates, P.C., Washington, DC, William G. Myers, III, Hol-

land & Hart LLP, Boise, ID, Michele Joy, Association of Oil Pipe Lines, Washington, DC, for Defendants.

## MEMORANDUM OPINION

HUVELLE, District Judge.

This case arises under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is before the Court on federal defendants' and defendant-intervenors' motions for summary judgment.[1] In response to two separate FOIA requests filed by plaintiffs, Carol Parker and Melvin Goldstein, for documents relevant to proposed pipeline projects in several states in the western United States, defendants, Bureau of Land Management ("BLM") and Department of the Interior, have withheld certain documents submitted by defendant-intervenors, Williams Pipeline Company ("Williams") and Equilon Pipeline Company ("Equilon"), pursuant to FOIA Exemption (b)(4). Plaintiffs have brought these consolidated lawsuits seeking disclosure of those documents. Because the Court finds that certain documents at issue were properly withheld from disclosure, and that one document was not properly withheld, the Court grants in part and denies in part defendants' and defendant-intervenors' motions for summary judgment.

## BACKGROUND

In late 1998, Equilon proposed to extend an existing 406–mile pipeline in New Mexico by 62 miles to the southeast to Odessa, Texas, and by 32 miles to the northwest to the Four Corners area. Equilon St. ¶ 1. In November 1998, Williams Pipeline Company sought a right-of-way ("ROW") from the Utah Office of the BLM ("Utah BLM") to construct and operate a pipeline from Bloomfield, New Mexico to Salt Lake City, Utah. *Id.* ¶ 2.[2] In April 1999, Equilon and Williams formed the Aspen Products Pipeline LLC ("Aspen"), which pursued both the New Mexico project proposed by Equilon and the Utah project proposed by Williams. *Id.* ¶ 3. On April 30, 1999, BLM published notice in the Federal Register of its intent to prepare an Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.,* for the Utah ROW application. Williams St. ¶ 4. In June 1999, Equilon submitted a ROW application for Aspen to the New Mexico State BLM for a pipeline from Odessa, Texas to Bloomfield, New Mexico. *Id.* ¶ 5; Equilon St. ¶ 5. Initially, the New Mexico BLM intended to prepare a separate Environmental Assessment ("EA") for the New Mexico portion of the project. Williams St. ¶ 5.

On June 17, 1999, Aspen submitted to Utah BLM a letter with attachments intended to "provide assurance that a project to Bloomfield, New Mexico [New Mexico ROW] will be pursued in the event that a permit to continue from that point to the Utah Front Range [Utah ROW] fails." Equilon St. ¶ 4; Williams St. ¶ 15. On October 8, 1999, Equilon, as a member of Aspen Pipeline, submitted to New Mexico

1. *Amicus curiae* briefs were filed by two groups: 1) The Association of Oil Pipe Lines and 2) East Mountain Telegraph, The Northside Signpost, Friends of Placitas, Sandia Knolls Neighborhood Association, Fox Hills Property Owners Association, Inc., Citizens for Safe Pipelines, Bernalillo Public Schools Board of Education, New Mexico Environmental Law Center, Forest Guardians, East Mountain Legal Defense Fund, New Mexico Public Interest Research Group Education

Fund, Las Placitas Association, Cedar Creek Homeowners Association, and Cedar Creek Water Cooperative.

2. The scope of the initial ROW application was slightly different but was amended on March 8, 2000, to cover a pipeline from Bloomfield, New Mexico to Utah. Fed. Def. Ex. 4 (Steah Decl. ¶ 4).

BLM a compilation of documents designed to demonstrate the independent utility of the proposed pipeline project represented by its application, and to show that the New Mexico ROW would be pursued even if the Utah ROW was not approved. Equilon St. ¶ 7; Williams St. ¶ 18. On November 29, 1999, Williams, on behalf of Aspen, submitted additional documents to the Utah BLM to demonstrate the independent utility of the Utah project, and to demonstrate the permissibility of conducting a separate NEPA review of the Utah and New Mexico projects, based on this independent utility. Williams St. ¶ 23.

The Utah BLM issued a letter on February 1, 2000, indicating that the two projects were connected and a single EIS would be prepared. Fed. Def. Ex. 4 (Steah Decl. ¶ 6). Aspen dissolved that spring, and Williams and Equilon are now pursuing the Utah and New Mexico projects separately. Williams St. ¶ 6. Williams amended the Utah ROW application in March 2000, and Equilon withdrew the New Mexico application. Fed. Def. Ex. 4 (Steah Decl. ¶ 7). Utah BLM began to process the Utah ROW, and Equilon refiled the New Mexico ROW application in April 2000. *Id.* The environmental impacts of the two proposed ROWs are not being considered in a single EIS as "connected actions." [3]

On July 20, 2000, plaintiff Carol Parker filed a FOIA request with the Utah BLM, seeking "copies of documentation relating to the decision to separate the Aspen Pipeline Project (now Williams Pipeline) into two analyses for NEPA purposes." Fed. Def. St. ¶ 2. On August 19, 2000, plaintiff Parker submitted another FOIA request to the Utah BLM, requesting "copies of the administrative record developed for the Aspen Pipeline Project which has now been withdrawn from BLM consideration." Equilon St. ¶ 14. On September 29, 2000, plaintiff Melvin Goldstein [4] submitted to the Utah BLM, and to the Washington D.C. headquarters of BLM a FOIA request for documents relating to "any and all written material in the possession of the Utah BLM, including, but not limited to, letters, notes, and the intra- or inter-agency memoranda, that pertains to the pipeline project that Williams proposes to build from Bloomfield, New Mexico, to Salt Lake City, Utah." Fed. Def. St. ¶ 1; Equilon St. ¶ 16. Plaintiff Goldstein also requested documents pertaining to the basis upon which the BLM determined that the Williams project has separate economic utility from the Equilon project. Equilon St. ¶ 17. In response to these requests, the BLM released over 3500 pages of documents and withheld three letters and/or their attachments pursuant to Exemption (b)(4) of the FOIA, 5 U.S.C. § 552(b)(4). Fed. Def. St. ¶ 3.

The documents withheld under Exemption (b)(4) are:

---

3. Under the regulations implementing NEPA promulgated by the Council on Economic Quality, an agency preparing an EIS must include within the scope of the EIS "connected actions." 40 C.F.R. § 1508 .25. Connected actions are "closely related and therefore should be discussed in the same impact statement." *Id.* Under the regulations, "[a]ctions are connected if they: (i)[a]utomatically trigger other actions which may require environmental impact statements; (ii)[c]annot or will not proceed unless other actions are taken previously or simultaneously; or (iii)[a]re interdependent parts of a larger action and depend on the larger action for their justification." *Id.* The New Mexico project is addressed in the Utah draft EIS as a "reasonably foreseeable project," but not as a "connected action." *See* Fed. Def. Ex. 4 (Steah Decl. ¶ 7).

4. Plaintiff Goldstein is counsel to Sinclair Oil Corporation, one of the defendant–intervenors' competitors in the region at issue and an opponent of the proposed pipeline projects. Williams Ex. 1 (Copley Decl. ¶ 5).

1) Appendix 1 to the October 8, 1999 letter from Equilon to Albert Gonzales of New Mexico BLM containing an Independent Utility Analysis with accompanying market studies showing the expected consumption and growth of markets in the Bloomfield, New Mexico market area; the existing pricing data verifying the economic justification of the pipeline from Odessa, Texas to Bloomfield, New Mexico; and how the Albuquerque and Four Corners, New Mexico fuel markets are currently being served and the impact of the pipeline on those markets. Fed. Def. St. ¶ 4.

2) A redacted copy of a [July 17, 1999] letter from Aspen to the Utah BLM, which was attached to an October 21, 1999 letter from Equilon to BLM officials Sally Wisely, LaVerne Steah, and Albert Gonzales, containing market data regarding the Albuquerque/Four Corners market demand for fuel, expected growth, price differentials, trucking costs, and other commercial information. *Id.*

3) Appendix 1 of the November 29, 1999 letter from Williams to BLM officials Joe Incardini and LaVerne Steah containing an Independent Utility Analysis with accompanying market studies showing the expected consumption and growth of markets in the Crescent Junction, Utah—Grand Junction, Colorado market area; the expected consumption of and growth of markets in the Salt Lake City, Utah market area; and Aspen Northern Project options independent from the Southern Project. *Id.*

Plaintiffs seek the disclosure of these three documents under FOIA, arguing that they do not fall within Exemption (b)(4). After this litigation was filed, BLM reviewed additional documents for release in response to plaintiffs' requests. This review resulted in the release of an additional 237 pages of documents, including one document, an April 7, 2000 e-mail from Laverne Steah of Utah BLM, with the names of potential New Mexico suppliers to the Utah pipeline redacted pursuant to Exemption (b)(4). Supp. Steah Decl. ¶¶ 3–4. Plaintiffs also seek release of an unredacted version of this e-mail.

## LEGAL ANALYSIS

### I. STANDARD OF REVIEW

In a FOIA case, the Court may award summary judgment solely on the information provided in affidavits or declarations when the affidavits or declarations describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C.Cir.1981). An agency must prove that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." *Goland v. Central Intelligence Agency,* 607 F.2d 339, 352 (D.C.Cir.1978), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980) (internal citation and quotation omitted).

### II. EXEMPTION (b)(4)

FOIA creates a statutory right for citizens to access government information. The central purpose of FOIA is to "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny" through the disclosure of government records. *See Department of Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (citation omitted). To further the broad policy of

disclosure embodied in FOIA, the Act instructs government agencies to make records available upon request, unless the request falls within one of nine exemptions. *See* 5 U.S.C. § 552(b). FOIA's Exemption (b)(4) permits an agency to withhold from disclosure "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 522(b)(4).[5] Plaintiffs do not dispute that the withheld documents contain commercial information obtained from a person. Rather, plaintiffs argue that the information is not privileged or confidential.

A. Voluntary or Mandatory Submission

■■ To determine whether the information is privileged or confidential within the meaning of Exemption 4, it is necessary to first resolve the issue of whether the information was provided to the government voluntarily or if it was required to be provided. If information was voluntarily provided, defendants must satisfy a lower threshold to prevent disclosure. *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871 (D.C.Cir.1992) (*en banc* ), *cert. denied,* 507 U.S. 984, 113 S.Ct. 1579, 123 L.Ed.2d 147 (1993). Under the test set forth in *Critical Mass,* financial or commercial information provided to the government on a voluntary basis is "confidential" for purposes of Exemption 4 if it is the kind of information that would customarily not be released to the public by the submitter. *Id.* at 872. If, however, the information was required to be submitted, in order to be considered confidential, defendants must demonstrate that disclosure of the information would either (1) impair the government's ability to obtain necessary informa-

tion in the future, or (2) cause substantial harm to the competitive position of the person from whom the information was obtained. *National Parks and Conservation Assn. v. Morton,* 498 F.2d 765, 770 (D.C.Cir.1974).

■ Defendants and defendant-intervenors argue that the information withheld by BLM was voluntarily provided. The Court of Appeals recently discussed the issue of voluntary submissions in *Center for Auto Safety v. National Highway Traffic Safety Admin.,* 244 F.3d 144 (D.C.Cir.2001). The Court held that "actual legal authority, rather than parties' beliefs or intentions, governs judicial assessments of the character of submissions." *Id.* at 149. The Court noted that "linking enforceability and mandatory submissions creates an objective test; regardless of what the parties thought or intended, if an agency has no authority to enforce an information request, submissions are not mandatory." *Id.*

■ In this case, the regulations governing federal right-of-way applications make clear that this information is not required as part of the application. *See* 43 C.F.R. § 2882.2–3. The ROW application is required to include: (1) the name and address of the applicant and the applicant's agent, if appropriate; (2) a description of the applicant's proposal; (3) a map, USGS quadrangle, aerial photo or equivalent, showing the approximate location of the proposed right-of-way and facilities on public lands and existing improvements adjacent to the proposal; (4) a statement of the applicant's technical and financial capability to construct, operate, maintain and terminate the proposals; (5) certifica-

---

**5.** Although FOIA exemptions are normally permissive rather than mandatory, the D.C. Circuit has held that the disclosure of material which is exempted under (b)(4) of FOIA is prohibited under the Trade Secrets Act, 18 U.S.C. § 1905. *CNA Financial Corp. v. Donovan,* 830 F.2d 1132, 1151 (D.C.Cir.1987).

tion by the applicant that he/she is of legal age, authorized to do business in the State and that the information submitted is correct to the best of the applicant's knowledge; and (6) disclosure of the applicant's citizenship and the business entity information required by § 2882.2–1 ... *Id.* The regulations provide that the applicant "may submit additional information to assist the authorized officer in processing the application," including "[a] description of the alternative route(s) and mode(s) considered by the applicant when developing the proposal," "[a] statement of need and economic feasibility or other proposal," and "[a] statement of the environmental, social and economic effects of the proposal." 43 C.F.R. §§ 2882.2–3(b)(2), (4)-(5). Therefore, the information at issue is not required as part of that application, and BLM had no authority to require that the information be submitted as part of the ROW application. Nor did BLM in fact require the submission of this information.[6] Williams Ex. 1 (Copley Decl. ¶¶ 13, 16, 24); Fed Def. Ex. 4 (Steah Decl.¶ 5); Fed Def. Ex. 3 (Gonzales Decl. ¶ 5); Equilon Ex. 1 (Werger.Decl.¶ 12); Second Steah Decl. ¶ 4.[7]

Plaintiffs nonetheless argue that the withheld documents were submissions re-

quired to be submitted under NEPA. BLM, like all federal agencies, is required to prepare either an EA or an EIS pursuant to NEPA, for any contemplated agency action that may have an effect on the environment. Thus, BLM undertook an environmental review under NEPA of both the New Mexico and Utah ROW applications. Plaintiffs argue that because BLM had an obligation to determine the scope of the EIS being prepared, and to determine whether the New Mexico and Utah projects were "connected actions" to be considered in a single EIS, the information submitted by defendant-intervenors to establish the independent viability of the projects was required. However, plaintiffs do not cite, and the Court cannot find, any provision in the NEPA regulations giving BLM the authority to compel submission of such materials to determine the scope of an EIS. As defendant-intervenors point out, the NEPA regulations instruct agencies to "invite the participation of ... the proponent of the action." 40 C.F.R. § 1501.7. The regulations neither mandate that agencies obtain such information from the proponent, nor provide agencies with the authority to compel proponents to submit particular information. Therefore, the

6. In addition to possessing the authority to compel submission, the agency must also exercise that authority in order for a submission to be deemed mandatory. Such a rule is consistent with the Court's ruling in *Center for Auto Safety.* The Court of Appeals did not hold that whenever an agency has the authority to require certain information, the submission of such information should be deemed mandatory, but that in the absence of such authority, a submission cannot be considered mandatory. 244 F.3d 144, 149. Indeed, in certain circumstances an agency may decline to require information that it has the authority to compel and instead pursue voluntary compliance.

7. Plaintiffs also argue that the November 13, 2000 letter from Denise Dragoo, outside

counsel to Williams, to LaVerne Steah at Utah BLM, is evidence that the submissions were involuntary, because Dragoo states in that letter, "[a]s part of the NEPA process, BLM *required* Williams to submit information supporting the independent utility of the Northern and Southern Projects." Pl.Ex. 3 at 3. This argument is unavailing, as the D.C. Circuit recently "reject[ed] the argument that, in assessing submissions for the purpose of Exemption 4 analysis, we should look to subjective factors, such as whether the respondents believed that the Information Request was voluntary, or whether the agency, at the time it issued the request for information, considered the request to be mandatory." *Center for Auto Safety,* 244 F.3d 144, 149.

Court concludes that the withheld documents were submitted voluntarily.

## B. Confidentiality

■ Because the withheld documents were submitted voluntarily, they will be exempt from disclosure if defendants and defendant-intervenors carry their burden of establishing that the documents are the kind of information that would not customarily be released to the public. *Center for Auto Safety*, 244 F.3d 144, 147–48; *Critical Mass*, 975 F.2d at 879. The Court must look at defendant-intervenors' customary treatment of this information, rather than how the industry as a whole treats it. *Center for Auto Safety*, 244 F.3d 144, 148.[8] Defendant–intervenors have submitted evidence that the withheld documents [9] are of a kind that they would not customarily disclose to the public because to do so would allow a competitor to gain knowledge of their business strategies and plans and to review market analysis and pricing. Equilon Ex. 1 (Werger Decl. ¶ 13); Williams Ex. 1 (Copley Decl. ¶¶ 3, 8–9). This is further supported by the fact that the Independent Utility Analysis that is Appendix 1 to the October 8, 1999 submission and the market analysis appended to the November 29, 1999 letter, which were contracted and paid for through a third-party contractor, are governed by confidentiality agreements between that contractor and Aspen. Equilon Ex. 1 (Werger Decl. ¶ 13); Williams Ex. 1 (Copley Decl. ¶ 3). Distribution within the company of these withheld documents was on a limited "need to know"

basis to prevent public dissemination. Equilon Ex. 1 (Werger Decl. ¶ 14). These types of limited disclosures, not made to the general public, do not preclude Exemption 4 protection. Plaintiffs have offered no evidence to show that defendant-intervenors customarily disclosed information of this kind to the public. Therefore, the Court concludes that defendants and defendant-intervenors have established that these documents are properly withheld under Exemption 4.

## C. Publicly Available

■ In the alternative, plaintiffs argue that the documents are not confidential because the information they contain is publicly available. To prevail on this argument, which is "entirely distinct" from the issue of customary disclosure, "the party favoring disclosure has the burden of demonstrating that the information sought is *identical* to information already publicly available...." *Center for Auto Safety*, 244 F.3d 144, 151 (emphasis in original). In support of this argument, plaintiffs have submitted the declaration of Malcolm Turner, a consultant in the petroleum industry. *See* Pl.Ex. 1.

■ Plaintiffs have filed as an exhibit an unredacted copy of the withheld June 17, 1999 letter which was inadvertently produced to them by BLM.[10] Turner has opined that the information contained in the unredacted copy of the June 17, 1999 letter is not confidential commercial data. Pl.Ex. 1 (Turner Decl. ¶¶ 7–8).[11] While

8. For this reason, the declaration of plaintiffs' expert, Malcolm Turner, that in his opinion the information contained in the withheld documents "would not usually be considered proprietary or confidential in the petroleum industry" (Pl.Ex.1, ¶¶ 10–11), is not probative.

9. The Court refers here only to the June 17, 1999 letter and the two independent utility

analyses. The April 7, 2000 e-mail is discussed in section C, *infra*.

10. *See* Supplemental Steah Decl. ¶ 5.

11. This information includes the current demand, projected market growth, prices, transportation costs, current suppliers, and potential customers in the Albuquerque, New

Williams concedes that the inadvertent disclosure moots the issue of exemption as to this document (Williams Reply at 1), Equilon argues that the issue is not moot because inadvertent production does not waive FOIA protection as to future requesters and because the Court may issue a protective order prohibiting further disclosure of the letter (Equilon Reply at 6). While it is true that inadvertent disclosure does not render the information publicly available for the purposes of future FOIA requests, *Martin Marietta Corp. v. Dalton*, 974 F.Supp. 37, 40 (D.D.C.1997), the issue of whether the document may be withheld in the future from other unidentified parties is not before the Court. In addition, no party to this litigation has moved for a protective order with respect to plaintiffs' use of this document. Therefore, the Court finds that there is no issue for the Court to decide with respect to the June 17, 1999 letter.

With respect to the Independent Utility Analysis, Appendix 1 to the October 8, 1999 letter, Turner has opined that "it is likely that the data contained in Appendix 1 was obtained from the same sources [as the information in the June 17 letter] and is not confidential information." Pl.Ex. 1 (Turner Decl. ¶ 10).[12] This testimony is wholly insufficient to establish that identical information is publicly available. Similarly, Turner has opined that the November 29, 1999 Appendix 1, which contains an independent utility analysis for the Utah project and expected consumption and growth information for the Crescent Junction, Utah—Grand Junction, Colorado

market area and the Salt Lake City market area, are readily available from public or commercial sources such as those mentioned above. *Id.* ¶ 11. Such testimony does not suffice to establish that identical information is publicly available. The fact that one could collect and analyze publicly available data relevant to those markets and compile an analysis of the utility of a pipeline project in those areas does not establish that the compilation and analysis, as opposed to some of the underlying data, are available publicly.

The utility analyses were done by two outside contractors who were paid a total of $237,919.87 for their work by the defendant-intervenors. Second Werger Decl. ¶ 6; Williams Ex. 1 (Copley Decl. ¶ 3). The documents contain market evaluations, pricing evaluations, and pricing trends calculated by the companies. Second Werger Decl. ¶ 5; Williams Ex. 1 (Copley Decl. ¶¶ 18, 21). While the contractors did compile information from public sources, they also evaluated and analyzed the information in the context of the proposed pipeline project. Second Werger Decl. ¶ 6; Williams Ex. 1 (Copley Decl. ¶¶ 18, 21, 23). It is undisputed that neither a compilation nor an analysis of such information is available publicly. Moreover, the utility analyses were undertaken by defendant-intervenors at considerable cost. Therefore, plaintiffs have failed to establish that information identical to the withheld information is available from public sources.

Finally, with respect to the April 7, 2000 e-mail, plaintiffs argue that this informa-

---

Mexico and Bloomfield, New Mexico/Four Corners markets. *Id.* ¶ 6.

**12.** According to Turner, with respect to the June 17, 1999 letter, the current demand, price differentials, estimated trucking transportation costs, and pipeline tariffs are publicly available from government regulatory and trade sources, the projected market growth may be estimated from publicly available data regarding population growth rates, and potential customers and projected rate of return for the project are not proprietary information "that would be advantageous to a competitor." Pl.Ex. 1 (Turner Decl. ¶¶ 7–8).

tion is identical to the information publicly available in the draft EIS prepared by BLM and other federal agencies for the Williams pipeline project, which reports that "Williams has stated that it will obtain supplies for its common carrier pipeline from a pipeline interconnection with the Giant refinery and potentially from a storage terminal owned by Navajo Refining in Bloomfield." Pl. Surreply Ex. B. The Court agrees that this information is now publicly available and therefore is not protected from disclosure under Exemption 4.[13] Therefore, an unredacted copy of this document must be produced.

### D. Impairment of Government Access to Information and Competitive Harm

Even if one were to assume that the withheld October 8, 1999 and November 29, 1999 attachments were required to be submitted, which is not the case, these documents would be properly withheld under Exemption 4 because release of the information would (1) impair the government's ability to obtain necessary information in the future, or it would (2) cause substantial harm to the competitive position of the person from whom the information was obtained. *National Parks,* 498 F.2d at 770. The Court finds that if agencies seeking assistance from private parties in fulfilling their obligations under NEPA cannot maintain the confidentiality of proprietary materials that have been submitted to it, the government's ability to obtain such information would be impaired. Notwithstanding that there may be certain factors which weigh in favor of voluntary submissions, if such potential advantages are outweighed by the risks of disclosure to competitors of confidential information,

it is likely that companies would decline to produce information.

Alternatively, defendant-intervenors have demonstrated that there is "actual competition and a likelihood of substantial competitive injury" that would flow from disclosure of these documents. *CNA Financial Corp. v. Donovan,* 830 F.2d 1132, 1152 (D.C.Cir.1987). Given that the compilation and analysis of the publicly available data were undertaken at significant cost, the Court of Appeals' observation in *Worthington Compressors, Inc. v. Costle,* is apropos here:

> If ... competitors can acquire the information only at considerable cost, agency disclosure may well benefit the competitors at the expense of the submitter. We believe the latter possibility deserves close attention in Exemption 4 cases. Because competition in business turns on the relative costs and opportunities faced by members of the same industry, there is a potential windfall for competitors to whom valuable information is released under FOIA. If those competitors are charged only minimal FOIA retrieval costs for the information, rather than the considerable costs of private reproduction, they may be getting quite a bargain. Such bargains could easily have competitive consequences not contemplated as part of FOIA's principal aim of promoting openness in government.

662 F.2d 45, 51 (D.C.Cir.1981). Because defendant-intervenors have established both actual competition in the markets at issue (Second Werger Decl. ¶¶ 4, 9; Williams Ex. 1 (Copley Decl. ¶ 5)), and likelihood of competitive harm (Second

---

**13.** Alternatively, defendants and defendant-intervenors have not demonstrated that the names of potential suppliers alone, as opposed to identification of suppliers as part of

the detailed market analysis described in the other withheld documents, are information of a kind not customarily disclosed.

Werger Decl. ¶¶ 5–6, 9; Williams Ex. 1 (Copley Decl. ¶¶ 8–9)), these documents fall within Exemption 4 even if the *National Parks* test were to be applied.[14]

### CONCLUSION

For these reasons, defendants' and defendant-intervenors' motions for summary judgment, are **GRANTED** in part and **DENIED** in part. A separate order shall issue this date.

### ORDER

For the reasons set forth in the accompanying Memorandum Opinion, the Defendants' and Defendant Intervenors' Motions for Summary Judgment [28–1, 35–1, and 58–1] are **GRANTED** in part and **DENIED** in part. Defendants shall produce the unredacted April 7, 2000 document within 5 days of this order. It is

**FURTHER ORDERED** that plaintiffs' complaint and defendant-intervenors' counterclaims are dismissed with prejudice.

---

14. In addition, because these documents fall within Exemption 4, their disclosure is also prohibited under the Trade Secrets Act, 18 U.S.C. § 1905. *CNA Financial Corp.*, 830 F.2d at 1151. The Court has therefore disposed of defendant-intervenors' counterclaims in this opinion as well.