**DEFENDERS OF WILDLIFE,**
et al., Plaintiffs,

v.

**UNITED STATES DEPARTMENT
OF THE INTERIOR, et al.,**
Defendants.

**No. CIV.A. 03–1192(ESH).**

United States District Court,
District of Columbia.

April 13, 2004.

William J. Snape, Washington, DC, for Plaintiffs.

James J. Gilligan, U.S. Department of Justice, Washington, DC, for Defendants.

### MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiffs have sued the United States Department of the Interior ("DOI") and the Office of Government Ethics ("OGE") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking records regarding Deputy Secretary J. Steven Griles' compliance with federal ethics laws and regulations relating to prohibited conflicts of interest. They challenge the adequacy of defendants' search for responsive documents, as well as their withholding of eleven documents pursuant to FOIA Exemptions 4, 5, and 6. Before the Court are the defendants' motion for summary judgment and plaintiffs' motion for partial summary judgment. For the reasons set forth below, each of the motions will be granted in part and denied in part.

### BACKGROUND

#### I. Ethics in Government Act

A brief discussion of relevant ethics laws and regulations governing the conduct of federal officers will be useful to understanding the nature of the documents that plaintiffs request and the reasons for defendants' withholdings. In general, federal law prohibits government officers or employees from using a public office for personal gain, 5 C.F.R. § 2635.702, or substantially participating in an official capacity through decision, approval, or otherwise, in matters in which they have a personal financial interest. 18 U.S.C. § 208(a); 5 C.F.R. § 2635.402(a), (c), and (e). To foster public confidence in the integrity of federal officials and to deter such conflicts of interest, the Ethics in Government Act of 1978 ("EIGA"), Pub.L. No. 95–521 (codified as amended at 5 U.S.C.App. 4), establishes a system of public financial disclosure by senior Executive Branch officials and nominees to positions requiring Senate confirmation. *See* S.Rep. No. 95–170, at 21–22 (1977). Disclosure is made on Form SF 278, *see* 5 C.F.R. § 2634.601, and must include detailed information about, *inter alia,* the filer's property, debts, positions held with a business or organization, terms of any continued payments from a former employer, and the identity and source of compensation received. 5 U.S.C.App. 4 § 102. These reports must be released to the public upon request. *Id.* § 105(b)(1), (d). Officials often execute "ethics agreements," committing to specific actions such as divestiture or recusal to alleviate any actual or apparent conflicts of interest resulting from their financial interests. 5 C.F.R. § 2634.802(a). Executive Branch agency heads, including the Secretary of the Interior, are charged with primary responsibility for administering the "ethics in government program" within each agency, 5 C.F.R. § 2638.102(a), while the Office of Government Ethics ("OGE")—a separate office within the Executive Branch created by the EIGA—provides overall direction of Executive Branch policies relating to conflicts of interest. 5 U.S.C.App. 4 § 402(a).

J. Steven Griles was nominated to serve as Deputy Secretary of the Interior on April 30, 2001, and was confirmed by the Senate on July 12, 2001. (Pl.'s Stmt. of Material Facts as to Which There is No Genuine Issue ["Pl.'s Stmt."] ¶ 2.) As the DOI's second-ranking official, Mr. Griles is responsible for managing public lands, including approximately 700 million acres of subsurface mineral rights. (*Id.* ¶ 3.) Before his appointment, Mr. Griles held executive positions with three energy lobbying firms, including J. Steven Griles and Associates, National Environmental Strategies ("NES"), and NES, Inc. In these positions, Mr. Griles represented a number of clients with energy interests, including an indus-

try consortium—the Coalbed Methane Ad Hoc Committee. (*Id.* ¶ 12.) On April 24, 2001, Mr. Griles wrote a recusal letter, describing how he would avoid any actual or apparent conflicts of interest upon his confirmation. (*Id.* ¶ 13.) This included, *inter alia*, stepping down from his positions with NES and NES, Inc. in return for severance payments, and recusing himself from certain agency activities that might impact these companies. (*Id.* ¶¶ 13–14, 18.)[1] This is particularly relevant here because the DOI's Bureau of Land Management ("BLM") is contemplating allowing oil and gas companies to drill coalbed methane ("CBM") wells on DOI-administered lands in Wyoming and Montana. (*Id.* ¶ 7.)

Mr. Griles' actions after taking office have prompted plaintiffs' FOIA inquiry. For example, he continued to meet with Marc Himmelstein, co-founder and head of NES. (*Id.* ¶ 22.) He also wrote and called the Environmental Protection Agency ("EPA") after it issued a draft environmental impact statement ("EIS") giving a poor rating to CBM mining in Wyoming. (*Id.* ¶ 23.) Thereafter, Mr. Griles met with the DOI Office of Solicitor and agreed that he would not participate in agency decisions concerning the EIS. On May 25, 2002, the Washington Post reported on Mr. Griles' potential conflicts of interest, and on June 20, 2002, the OGE contacted DOI to request that they address whether Mr. Griles had violated any ethics rules or

his recusals. (*Id.* ¶¶ 26–27.) As a result, the OGE and DOI exchanged information and analyses concerning Mr. Griles' ethics compliance. In mid-March 2004, DOI's Office of Inspector General ("OIG") concluded an eighteen-month investigation and issued a report on these and other ethical questions surrounding Mr. Griles. OGE issued an opinion indicating that it would have advised Mr. Griles not to have contacted the EPA regarding the EIS, but it did not specifically conclude that an ethics violation had occurred. *See* Plaintiffs' Notice of Supplemental Authority and attachments thereto (filed on April 7, 2004).

## II. Plaintiffs' FOIA Requests

Plaintiffs are not-for-profit organizations concerned with protecting the environment. On September 25, 2002, in order to "better understand how federal ethics laws were being applied at the Department of the Interior," specifically with regard to payments Mr. Griles was receiving from his former employers and as "to whether Mr. Griles was adhering to his several recusal agreements" (Pls.' Mot. for Partial S.J. ["Pls.' Mot."] at 11), they submitted a FOIA request to DOI seeking records relating to the financial disclosure reports, financial interests, ethics agreements, and other contracts or agreements of three named individuals: Mr. Griles, his Special Assistant Holly Hopkins, and Associate Deputy Secretary of the Interior James Cason.[2] (Sloca Decl., Ex. A.) In response,

---

1. On August 1, 2001, Mr. Griles signed four "Statements of Disqualification," repeating all of the recusal statements that he made in his April 24, 2001 letter. (Pl.'s Stmt. ¶ 21.)

2. Defenders of Wildlife and Friends of the Earth submitted the original request, which sought:

1. all financial disclosure reports, including Forms SF 278, filed by J. Steven Griles, Holly Hopkins, or James Cason . . . .

2. any documents relating to the financial interests of Mr. Griles, Ms. Hopkins, or Mr. Cason . . . .

3. any documents relating to ethics agreements (whether oral or written) with J. Steven Griles, Holly Hopkins, or James Cason . . . includ[ing] any recusal, divestiture, or resignation agreements themselves, including a correspondence from J. Steven Griles to Wendell Sutton, DOI Human Resources Office, during 2001, in which Mr. Griles agreed to recuse himself regarding matters concerning J. Steven Griles and Associates,

on December 6, 2002, DOI provided plaintiffs with copies of public financial disclosure reports filed by the named individuals and continued to process the request. On January 8, 2003, DOI sent plaintiffs an additional thirty-two pages and indicated that 352 pages were being withheld under FOIA exemptions. (Pls.' Stmt. ¶¶ 38–39.) DOI also referred one letter to OGE for a release decision. When plaintiffs appealed, DOI notified them by letter dated March 3, 2003, that the Office of Solicitor was reviewing the withholdings, but that their appeal in all other respects was denied. (*Id.* ¶ 44.) The Office of Solicitor released an additional forty-two pages of responsive documents by letter dated September 25, 2003.[3] (Defs.' Stmt. of Material Facts as to Which There Is No Genuine Issue ["Defs.' Stmt."] ¶ 13.) OGE notified plaintiffs that it would not release the three-page letter that DOI had referred to it, and it denied plaintiffs' appeal of this decision. (Pls.' Stmt. ¶¶ 45, 47; Defs.' Stmt. ¶ 18).

Additionally, on March 11, 2003, plaintiffs made a FOIA request of OGE that was basically identical to the one that had been sent to DOI. OGE processed the request, and on September 7, 2003, it forwarded seventy-three pages of responsive material to plaintiffs, withholding approximately sixty additional pages based on FOIA exemptions. (Defs.' Stmt. ¶ 26.)

Plaintiffs filed their complaint on June 3, 2003, claiming that defendants failed to produce agreements between Mr. Griles and his former firms (Count I) and withheld documents without authorization (Count II).[4] (Compl. ¶¶ 58–68.) The parties have filed cross-motions for summary judgment. They ask the Court to compel defendants to conduct an adequate search for records responsive to their FOIA requests, and they seek release of eleven specified documents. (Pls.' Mot. at 3 & n. 1.)

## ANALYSIS

### I. Standard of Review

 In a FOIA case, the Court may award summary judgment solely based on the information provided in affidavits or declarations when they describe "the justifications for nondisclosure with reasonably

---

National Environmental Strategies, or NES, Inc.;
4. all documents relating to contracts, agreements, or communications, including the contracts and agreements themselves, between Mr. Griles and:
 a) his former and/or current clients;
 b) J. Steven Griles and Associates;
 c) National Environmental Strategies; and/or
 d) NES, Inc.;
5. any documents regarding Mr. Griles, Ms. Hopkins, or Mr. Cason generated pursuant to 5 C.F.R. Parts 2634, 2635, or 2640, including, but not limited to:
 a) written disqualification statements . . .;
 b) requests for, and authorizations granting, waivers . . . regarding personal and business relationships of Federal employees; [and]
 c) any disclosures and any determinations made pursuant to 18 U.S.C.

§ 208(b)(1) or 5 C.F.R. § 2635.403(b)
. . . .
(Sloca Decl., Ex. A at 5.)

3. According to defendants, the Solicitor's Office was not searched in response to plaintiffs' FOIA request. (Sloca Supp. Decl. ¶ 5; Defs.' Reply at 25.) It appears, however, that the Ethics Office was transferred into the Solicitor's Office at some point during the pendency of plaintiffs' FOIA request and appeal. (Simmons Decl. at 1 n. 1.) Thus, Ms. Sloca's assertion that "all of the materials produced in response to the FOIA Request came from the Department Ethics Office" (Sloca Decl. ¶ 4), is not necessarily inconsistent with the release of these documents by the Solicitor's Office.

4. Plaintiffs have voluntarily dismissed Counts III and IV. (Pls.' Mot. at 3 n. 1.)

specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir.1981). An agency must prove that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." *Goland v. Cent. Intelligence Agency*, 607 F.2d 339, 352 (D.C.Cir.1978) (internal citation and quotation marks omitted). Summary judgment is not warranted if the declarations are "conclusory, merely reciting statutory standards, or . . . too vague or sweeping." *King v. United States Dep't of Justice*, 830 F.2d 210, 219 (D.C.Cir.1987) (internal citation and quotation marks omitted).

## II. Adequacy of the Search

▆▆▆▆ As an initial matter, plaintiffs allege that responsive documents were overlooked because the DOI and OGE conducted inadequate searches. Under FOIA, a defendant agency is obligated to conduct a "reasonable" search for responsive records using methods which can be reasonably expected to produce the information requested by plaintiff to the extent it exists. *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C.Cir.1983). "[T]he competence of any records-search is a matter dependent upon the circumstances of the case." *Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 834 (D.C.Cir.1979). In response to a challenge to the adequacy of its search, the agency may provide a "reasonably detailed affidavit, setting forth the search terms and type of search performed, and averring that all files likely to contain responsive materials . . . were searched." *Oglesby v. United States Dep't of the Army*, 920 F.2d 57, 68 (D.C.Cir. 1990). The agency need not "set forth

with meticulous documentation the details of an epic search for the requested records," *Perry v. Block*, 684 F.2d 121, 127 (D.C.Cir.1982) ("in the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with the obligations imposed by the FOIA"), but it must show that the search method was "reasonably calculated to uncover all relevant documents." *Weisberg*, 745 F.2d at 1485; *see also Oglesby*, 920 F.2d at 68 (FOIA requires an agency to conduct only a reasonable search for requested records using "methods reasonably expected to produce the information requested"). "The issue is not whether any further documents might conceivably exist but rather whether the government's search for responsive documents was adequate." *Perry*, 684 F.2d at 128. Agency declarations in this regard are afforded a presumption of good faith. *See SafeCard Services, Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C.Cir.1991). An adequate affidavit can be rebutted only "with evidence that the agency's search was not made in good faith." *Trans Union LLC v. Fed. Trade Comm'n*, 141 F.Supp.2d 62, 69 (D.D.C.2001) (citing *Maynard v. Cent. Intelligence Agency*, 986 F.2d 547, 559 (1st Cir.1993); *Miller v. United States Dep't of State*, 779 F.2d 1378, 1383 (8th Cir.1985)).

### A. DOI Search

In support of the adequacy of its search, DOI has submitted declarations and supplemental declarations from Sue Ellen Sloca, FOIA Officer for the DOI Office of Secretary ("OS"), and Shayla Freeman Simmons, Director of DOI's Ethics Office and DOI's Designated Agency Ethics Official ("DAEO"). These declarations describe the process by which DOI searched for responsive documents. In short, Ms.

Sloca avers that upon receipt of plaintiffs' request, she determined that, given the nature of the materials sought, they were most likely to be found in two places within the OS: (1) the Secretary's Immediate Office, where the three named individuals were employed; or (2) the DOI Ethics Office, which manages the DOI's ethics program. (Sloca Decl. ¶ 3.) Ms. Sloca forwarded a copy of plaintiffs' request to Nancy Appler, who handles FOIA requests for the Secretary's Immediate Office, who also sent a copy of the request to Shayla Freeman Simmons to conduct a search of the Ethics Office files. (*Id.*) Both offices conducted searches.[5]

 Plaintiffs take issue with numerous aspects of the search of the Secretary's Immediate Office. First, plaintiffs allege that the three named individuals may have improperly withheld repetitive documents. (Pls.' Reply at 3.) Ms. Appler gave Mr. Griles, Ms. Hopkins, and Mr. Cason copies of the FOIA request and asked them to search their individual paper and electronic files, which they did.[6] (Sloca Decl. ¶ 3; Sloca Supp. Decl. ¶ 9.) After the Ethics Office conducted its search and identified responsive documents, the materials deemed responsive by the Ethics Office were reviewed, and it was determined that "[n]either Mr. Griles, Mr. Cason, or Ms. Hopkins had any *additional* responsive documents, either because they had never generated such documents or because the potentially responsive documents had been generated prior to the start of their employment with the Department and had never come within the Department's possession or control." (Sloca Decl. ¶ 4 (emphasis added); *see also* Sloca Supp. Decl. ¶ 9.)[7] Plaintiffs argue that "[t]here is nothing in the FOIA statute that permits an agency official to withhold responsive records on the grounds that a same, similar, draft or annotated version of the record may be located elsewhere in the agency or anoth-

---

5. Plaintiffs allege that Ms. Sloca's declaration is objectionable hearsay because she neither saw any of the records reviewed by the three named individuals nor performed an independent review of their search. (Pls.' Reply at 3.) This argument is unavailing. Ms. Sloca is the FOIA officer for the OS and was "familiar with the steps taken" by DOI in response to plaintiffs' request. (Sloca Decl. ¶ 1.) "In cases where documents are collected from several different offices . . . the affidavit of the officer ultimately responsible for the supervision of the FOIA search is sufficient," *Trans Union*, 141 F.Supp.2d at 68–69; *see also Safe-Card*, 926 F.2d at 1201. "There is no need for the agency to supply affidavits from each individual who participated in the actual search," *Carney v. United States Dep't of Justice*, 19 F.3d 807, 814 (2d Cir.1994), nor is there any requirement that the subjects of the search are precluded from searching their own files.

6. Ms. Hopkins searched Mr. Griles' records, which she, as his Special Assistant, is responsible for maintaining. (Sloca Supp. Decl. ¶ 9.)

7. Plaintiffs initially alleged that DOI's Ethics Office search was also inadequate. (Pls.' Mot. at 21 & n. 10.) However, Ms. Simmons has provided a supplemental declaration adequately describing the methods used to search the Office of Ethics' records, as well as the search terms used. (Simmons Supp. Decl. ¶¶ 4–5.) Specifically, she describes the search, which encompassed the "single consolidated paper file" the office maintains on each political appointee, as well as a full-text search on the office's shared computer drive, using the last names of the three individuals. (*Id.* ¶ 4.) Additionally, the four Ethics Office personnel involved with matters pertaining to the three named individuals, Ms. Simmons herself, and the office's Deputy Director all searched their hard copy and electronic files, including e-mail. (*Id.* ¶ 5.) Based on this declaration, it appears that the Ethics Office's search was adequate, as it could be "reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68.

er agency." (Pls.' Reply at 3.) While the Court agrees that records may not be withheld simply because a similar, draft, or annotated version was produced by another part of the agency, it would be illogical and wasteful to require an agency to produce multiple copies of the exact same document. *Cf. Crooker v. United States State Dep't*, 628 F.2d 9, 10–11 (D.C.Cir.1980) (declining to require one agency to produce copies of the same records already produced by another agency, because FOIA's purpose of providing access to government materials had already been satisfied). The search was not inadequate simply because it failed to produce duplicate copies of responsive records.

 Plaintiffs next assert that DOI's failure to produce a final version of a severance agreement between Mr. Griles and his former firms constitutes proof that the search was inadequate. DOI obtained drafts of these agreements (Simmons Supp. Decl. ¶ 6), and plaintiffs argue that "[i]t strains credulity for Defendants to have obtained drafts . . . without ever having obtained the final agreement(s)." (Pls.' Mot. at 19.) As plaintiffs note, an agency may not ignore "positive indications of overlooked materials." *Valencia–Lucena v. United States Coast Guard*, 180 F.3d 321, 326 (D.C.Cir.1999) (internal citation and quotation marks omitted). It should have been clear that plaintiffs' request encompassed a final agreement. However, the agency cannot turn over a document it does not have. Ms. Simmons claims that there is no evidence that the agency received a final copy, and that it is normal for an agency to view only drafts of such an agreement. (Simmons Decl. ¶ 10; Simmons Supp. Decl. ¶ 6; *see also* Him-

melstein Decl. ¶ 4 ("*After* DOI reviewed the draft agreement, it was finalized . . . .") (emphasis added).) "[S]peculation that as yet uncovered documents may exist" does not undermine an otherwise adequate search. *SafeCard*, 926 F.2d at 1201; *see also Meeropol v. Meese*, 790 F.2d 942, 953 (D.C.Cir.1986) ("[e]ven if we assume that the documents plaintiffs posit were *created*, there is no reason to believe that [they] . . . still exist," or if they exist, are in the agency's possession) (internal citation and quotation marks omitted). Although it may be "troubling" (Pls.' Reply at 6), the fact that DOI's search did not turn up the final copy of a document it reviewed and commented on in draft form does not prove an inadequate search absent something more than mere speculation that defendants must have received it.[8]

 Next, plaintiffs claim the search was inadequate because, within the Secretary's Office, only the files of the three named individuals were searched. (Pls.' Mot. at 19–20.) This claim is not well-founded. An adequate search may be limited to the places most likely to contain responsive documents. *Schrecker v. United States Dep't of Justice*, 217 F.Supp.2d 29, 34–35 (D.D.C.2002), *aff'd*, 349 F.3d 657 (D.C.Cir.2003). Ms. Sloca's declaration indicates that ethics-related documents "receive only the most limited distribution to personnel," and they are "not kept in general office files other than those of the individuals to whom they pertain, or the Department Ethics Office," so there was no reason to believe that responsive materials would be located anywhere but in the files of the three named individuals. (Slo-

---

8. Likewise, defendants' failure to produce a specific OGE request for additional information (*see* Pls.' Mot. at 19 n. 7) does not, itself, render the search inadequate. *Meeropol*, 790 F.2d at 953. In fact, an *in camera* review of the November 29, 2002 DOI response to this request (OGE *Vaughn* No. 11) reveals that the request appears to have been oral, and thus, it is not surprising that DOI's search did not produce a document to this effect.

ca Supp. Decl. ¶ 8; *see also* Simmons Supp. Decl. ¶ 3.) Similar searches have been sustained as sufficient. *See, e.g., Judicial Watch, Inc. v. United States Dep't of Health & Human Svcs.*, 27 F.Supp.2d 240, 241, 244 (D.D.C.1998) (finding a search was adequate where the agency forwarded a request to appropriate offices with instructions to conduct searches for responsive documents); *Exxon Corp. v. Fed. Trade Comm.*, 466 F.Supp. 1088, 1094 (D.D.C.1978), *aff'd*, 663 F.2d 120 (D.C.Cir. 1980) (finding a search was adequate where "[a]ll the offices that could have been in possession of responsive documents were sent copies of the request with instructions to search for responsive documents" and all potentially responsive records were searched).

However, in support of their argument that defendants do not justify their "failure to search other offices within the Office of the Secretary," plaintiffs submit the declaration of Kristen Sykes, a Friends of the Earth employee who monitors DOI activities. Ms. Sykes lists several individuals who appear to have been involved with ethics issues relating to Mr. Griles whose files she alleges should have been searched. (Sykes Decl. ¶ 11.) Three of these merit further discussion.[9] Ms. Sykes' declaration states her "understanding" that Mark Pfiele, DOI's Press Secretary, and Eric Ruff, DOI's Director of Communications, coordinated DOI's press strategy with respect to allegations regarding Mr. Griles' conduct, and would

likely have responsive documents. (Sykes Decl. ¶ 11.) Ms. Simmons disputes this assertion, stating that there was no coordinated press strategy, and thus, "no reason to believe" that Mr. Pfeile or Mr. Ruff would be likely to possess responsive documents, for even though she acknowledges that there was at least one meeting with them to discuss a pending press interview, she neither provided documents to them nor had any reason to believe that they generated responsive documents. (Simmons Supp. Decl. ¶¶ 12–13.) Additionally, Ms. Sykes alleges that Sue Ellen Woolridge, Deputy Chief of Staff and Counselor to the Secretary, acted as Mr. Griles' "ethics filter," was involved in drafting certain recusal documents, and was likely to have responsive records. (Sykes Decl. ¶ 11.) Arguing that DOI's failure to search Ms. Woolridge's files was "inconceivable," plaintiffs point to a fax from the DOI Deputy Ethics Director (Pls.' Ex. QQ), advising the OGE to call either the director or Ms. Woolridge with questions about a news story concerning Mr. Griles. (Pls.' Reply at 5 n. 3.) But Ms. Simmons had "no reason to believe" that Ms. Woolridge possessed any responsive documents because she did not in fact act as an "ethics filter," did not generate relevant documents herself, and routinely returned briefing materials to Ms. Simmons. (Simmons Supp. Decl. ¶ 12.) Given Ms. Simmons' explanations, Ms. Sykes' assertions do not amount to sufficient evidence to establish that the

---

9. Of the sixteen individuals on Ms. Sykes' list, DOI actually searched the files of seven. (Sloca Supp. Decl. ¶ 9; Simmons Supp. Decl. ¶ 5.) The files of another employee, who was no longer employed by the DOI at the time of the search, were maintained by the Ethics Office, which was searched for responsive documents. (Simmons Supp. Decl. ¶ 14.) As to another two, Ms. Sykes alleges that it is reasonably possible that Secretary Gale Norton and her Chief of Staff Brian Waidmann

would have responsible documents. (Sykes Decl. ¶ 11). Ms. Simmons, however, found "no reason to believe" that either possessed responsive documents (Simmons Supp. Decl. ¶ 11), and Ms. Sykes' speculation hardly suffices to establish an unreasonable search. *SafeCard*, 926 F.2d at 1201; *Perry*, 684 F.2d at 127. Another three individuals were in the Solicitor's Office or the OIG (Sloca Supp. Decl. ¶ 11), and are addressed *infra* at pp. 12–14.

search was inadequate. *Perry*, 684 F.2d at 127.

Plaintiffs also argue that "[t]he location and identification of key DOI records by OGE and not DOI" provides sufficient proof that the search was inadequate. (Pls.' Mot. at 22 n. 11; *see also* Pls.' Reply at 7–8.) Specifically, plaintiffs point to six documents, each written by Mr. Griles or another OS employee (Ms. Sullivan), with each either addressed to the OS or written on its letterhead.[10] (Pls.' Reply at 8.) This Circuit has recognized that discovering additional documents after an agency turned over the fruits of its search "is more probative that the search was not thorough than if no other documents were found to exist." *Goland*, 607 F.2d at 370.[11] Though DOI was not required to search every record system, *Oglesby*, 920 F.2d at 68, the appearance of additional documents after its search is certainly probative that the search may not have been adequate. It is telling that OGE, rather than DOI, ultimately turned over the documents.

When an agency releases responsive records it previously withheld, "additional releases suggest a stronger, rather than a weaker, basis for accepting the integrity of the search" because "what is expected of a law-abiding agency is that it admit and correct error when error is revealed."[12] *Meeropol*, 790 F.2d at 952 (internal citation and quotation marks omitted). However, here the OGE turned over documents that DOI previously failed to discover. Thus, DOI's failure to locate these documents may indicate that the search was not "reasonably calculated to uncover all relevant documents." *Weisberg*, 705 F.2d at 1351. However, since defendants have not yet had the opportunity to address these documents, which were specifically identified and addressed in plaintiffs' Reply at 8, the Court will permit defendants to explain, within the next forty-five (45) days, why these documents were not previously produced by DOI or to conduct a further search of the offices of Mr. Griles and Ms. Sullivan.

10. Other documents OGE discovered were prepared after DOI's FOIA search began, (Vaswani Decl. ¶¶ 21), and thus are not covered by that request. *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 644 (D.C.Cir.2002); *see also* 43 C.F.R. § 2.21(a) ("In determining which records are responsive . . . the bureau will include any records in its possession and control *as of the date it begins its search*." (emphasis added)). Plaintiffs also now appear to concede that the absence of "an opinion letter discussing any potential COIs and how they will be handled" (Vaswani Decl. ¶ 22), either did not exist or referred to a letter already released. (Defs.' Reply at 34.)

11. In *Goland*, an agency affidavit indicated that "no additional documents could be located absent an extraordinary effort not required by the FOIA," and the later discovery of additional documents—by a librarian in an unindexed box at an off-site retired-records storage facility during research unrelated to the FOIA litigation—ultimately did not suffice to overturn the district court's determination that the search was adequate. *Id.* at 369–70.

12. This appears to be the case with the 42 pages of additional documents released by DOI after this litigation commenced. As Ms. Sloca's declaration indicates, these documents were not the product of a later search, but were "gathered in connection with the one and only search that the Department carried out." (Sloca Supp. Decl. ¶ 12.) DOI initially withheld them under FOIA exemptions, but upon further review, decided to release them. (*Id.*) Plaintiffs are therefore incorrect in their claim that this indicates an inadequate search. (Pls.' Mot. at 23 (citing *Wilderness Soc'y v. Bureau of Land Mgmt.*, No. 01–2210, 2003 WL 255971, at *7 n. 16 (D.D.C. Jan. 15, 2003) (quoting *Goland*, 607 F.2d at 370)).) For, unlike *Goland*, these documents were not overlooked during the first search, and DOI's subsequent decision to release them demonstrates not a lack of integrity but a willingness to correct a mistake. *Meeropol*, 790 F.2d at 952.

■ Plaintiffs' final challenge to the DOI search further establishes its inadequacy. It centers on DOI's failure to search other DOI offices, including the Solicitor's Office and the Office of the Inspector General. DOI argues that it was not required to search those offices, or even notify them of plaintiffs' request, because plaintiffs directed their inquiry specifically to the OS. (Defs.' Reply at 25–26; Sloca Supp. Decl. ¶¶ 4–5.) But DOI inexplicably bases this argument on superseded regulations that, as of November 2002, were replaced by new regulations that govern DOI's responses to FOIA requests.[13] Though defendant is correct that DOI regulations instruct FOIA requesters to direct their inquiries to the DOI office or bureau where the records are believed to be located, 43 C.F.R. § 2.10(b), the regulations currently in effect also require an agency that receives a request for materials "not in its possession, but which it knows another bureau has or is likely to have," to "refer the request to that bureau(s) for response." 43 C.F.R. § 2.22(a)(1). Other

DOI offices were involved in looking into ethics questions involving Mr. Griles. Specifically, the Deputy Associate Solicitor advised Mr. Griles in writing on May 3, 2002—four months prior to plaintiffs' request—regarding his involvement with the EIS. (Pls.' Stmt. ¶ 24.) Additionally, the OIG conducted an investigation into Mr. Griles' ethics matters. (Rohmer Decl. ¶¶ 3, 5, 7; Pls.' Stmt. ¶ 33.) Given the high-profile nature of these ethics concerns, including a front-page *Washington Post* article dated the same day as plaintiffs' FOIA request (Pls.' Ex. M [Eric Planin, *Official's Lobbying Ties Decried,* Wash. Post, Sept. 25, 2002, at A1]), and the fact that the OIG's mission is to investigate such alleged ethics violations (Rohmer Decl. ¶ 2), it would strain credulity to find that the Secretary's Office did not know that the Office of the Inspector General and the Solicitor's Office would be likely repositories of responsive records. Thus, the Office of the Secretary should have referred plaintiffs' request to the Solicitor's Office and the Office of the Inspec-

---

**13.** Defendants rely on the former version of 43 C.F.R. § 2.15(a), which provided that "[u]nless a request clearly specifies otherwise, requests to field installations of a bureau may be presumed to seek only records at that installation and requests to a bureau head or bureau FOIA officer may be presumed to seek only records of that bureau." 52 Fed.Reg. 45,584 (Nov. 30, 1987) (now superseded). However, regulations published in the Federal Register on October 21, 2002, superseded those relied upon by defendants. 67 Fed.Reg. 64,527 (Oct. 21, 2002).

DOI claims to have concluded its search for responsive materials on November 14, 2002 (Sloca Decl. ¶ 4), though it did not finish processing the request until January 2003. (Pls.' Stmt. ¶ 38; Sloca Decl. ¶ 6.) The new regulations took effect on November 20, 2002, but they do not specify whether they apply to agency responses, like this one, already in progress on the effective date. 67 Fed.Reg. 64,527. However, these are procedural regulations which may be applied to searches predating their effective date. *Nat'l Mining As-*

*soc. v. Dep't of Labor,* 292 F.3d 849, 859 (D.C.Cir.2002) (procedural rules may be applied retroactively; in contrast, a substantive rule may not be applied retroactively if it takes away or impairs vested rights, creates a new obligation, imposes a new duty, or attaches a new disability with respect to transactions or considerations already past). As such, DOI should have followed the new regulations when responding to plaintiffs' request because, rather than imposing some new substantive liability or right, the rules merely changed the procedural requirements within DOI for dealing with FOIA requests. Further, the new regulations did not require the OS to search files that it already searched. They merely required the OS to refer plaintiffs' request to other DOI offices, so those offices could conduct their own searches. The additional effort required would be minimal, and accordingly, OS should not be allowed to avoid referring plaintiffs' request to other DOI offices based on superseded regulations.

**14**

tor General because those offices were likely to have additional responsive documents. 43 C.F.R. § 2.22(a)(1).

In short, defendants' search was not sufficiently thorough because they failed to refer plaintiffs' request to the Office of Inspector General and the Solicitor's Office. 43 C.F.R. § 2.22(a)(1). Defendants must now refer plaintiffs' FOIA request to those offices forthwith.[14]

## B. OGE Search

In addition to challenging DOI's search, plaintiffs also contest the adequacy of OGE's search, arguing that it was defective due to "the lack of any independent search" of the OGE General Counsel and Director's offices. (Pls.' Reply at 8 n. 6.) Elaine Newton, who was responsible for processing the FOIA request to the OGE, addressed these concerns in her initial and supplemental declarations. With respect to the General Counsel's office, she explained the manual search of the office's conflict of interest files; the automated search of the office's electronic files, including terms searched, and how that search was updated; her consultation with OGE attorneys working on matters pertaining to Mr. Griles; and why certain other files identified by plaintiffs were not searched. (Newton Decl. ¶¶ 11, 14–15; Newton Supp. Decl. ¶¶ 4, 7–10, 13, 15, 17.) Further, Ms. Newton explained that the Director's Office, which was not responsible for matters pertinent to plaintiffs' claims, was not searched because it was not likely to have responsive materials.[15] (Newton Supp. Decl. ¶¶ 11–12.) Plaintiffs' vague challenge fails to establish inconsistencies or countervailing evidence that the OGE search was inadequate, and thus, Ms. Newton's declarations support the conclusion that the OGE search was adequate. *Perry*, 684 F.2d at 127. Nor have plaintiffs produced any evidence that OGE's search was in bad faith. *Trans Union*, 141 F.Supp.2d at 69. Thus, their challenge to the adequacy of OGE's search must fail.[16]

14. Many of plaintiffs' other criticisms of DOI's search have been addressed by the supplemental declarations of Ms. Sloca and Ms. Simmons. For example, Ms. Sloca answers plaintiffs' charge that "DOI failed to explain its offices [or] various systems of records" (Pls.' Mot. at 19), by describing the "decentralized" nature of its offices and explaining that the places most likely to contain responsive documents were searched. (Sloca Supp. Decl. ¶¶ 2,8.) FOIA does not require defendants to provide a "comprehensive list of records systems unlikely to contain responsive records." *Maynard*, 986 F.2d at 563. Additionally, in response to plaintiffs' allegation that defendants fail to indicate whether anyone "actually searched the offices of Mr. Griles, Ms. Hopkins, or Mr. Cason," or the "e-mail and other computer records of the Office of Secretary ..., particularly Mr. Griles' computer and office files." (Pls.' Mot. at 20–21 & n. 9), Ms. Sloca's supplemental declaration avers that such a search was conducted. (Sloca Supp. Decl. ¶ 9.) Plaintiffs' complaint about second-hand knowledge of the Ethics Office search (Pls.' Mot. at 21 n. 10) is also addressed by a first-hand descrip-

tion by Ms. Simmons. (Simmons Supp. Decl. ¶¶ 4–6.)

15. In response to plaintiffs' declaration citing ethics-related correspondence addressed to the Director as evidence that the Director's Office should have been searched (Vaswani Decl. ¶ 28), Ms. Newton explains that correspondence from other agencies regarding ethics compliance, which is typically addressed to the Director as a routine matter, is routed to the appropriate OGE office and does not reflect that office's involvement in these matters. (Newton Supp. Decl. ¶ 12.)

16. Plaintiffs' other challenges to the OGE search appear to have been satisfactorily addressed by Ms. Newton's supplemental declaration. For example, plaintiffs originally challenged OGE's failure to search certain files and update a computerized search. (Pls.' Mot. at 24–25.) Ms. Newton's supplemental declaration described the adequacy of the search by explaining that many of these files were in fact searched, others were not searched for valid reasons, and alternative methods were undertaken to update the com-

Accordingly, plaintiffs' request for a further search of OGE is denied. However, because there are issues relating to the adequacy of DOI's search, defendants' motion for summary judgment as to the DOI search cannot be granted.[17]

## III. Exemptions

 The remaining issue is whether defendants properly withheld certain documents under Exemptions 4, 5 and 6. An agency must promptly make available any records requested by members of the public, unless the agency can establish that the information is properly withheld under any of the nine exemptions set forth in the statute. *See* 5 U.S.C. § 552(b). These exemptions are exclusive, and should be narrowly construed. *Rose*, 425 U.S. at 361, 96 S.Ct. 1592. When a challenge is made to an agency's decision to withhold information, the burden of proof rests on the agency to sustain its decision, and the reviewing court is directed to "determine the matter de novo." 5 U.S.C. § 552(a)(4)(B). At the same time, of course, it must be recognized that FOIA represents a carefully considered balance between the right of the public to know what their government is up to and the often compelling interest that the government maintains in keeping certain information private. *See John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152–53, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989). As such, the exemptions must be given "meaningful reach and application." *Id.* at 152, 110 S.Ct. 471. In a FOIA case, the agency generally meets its burden by providing affidavits describing the material withheld and the reasons that it fits within one or more of the exemptions. However,

in this case, the Court also reviewed *in camera* all of the withheld documents.

## A. Exemption 4

 Plaintiffs seek the release of three draft severance agreements between Mr. Griles and his former firms, which defendants have withheld under Exemptions 4 and 6. (DOI *Vaughn* Index Nos. 5, 29, 30.) FOIA's Exemption 4 permits an agency to withhold from disclosure "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). The terms "commercial" and "financial" in FOIA's Exemption 4 are given their ordinary meanings. *Pub. Citizen Health Research Group v. Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C.Cir.1983). Defendants' general description of the draft agreements—that they include financial information surrounding Mr. Griles' separation from his former company (Himmelstein Decl. ¶¶ 2–3)—is sufficient to establish that the agreements are within the common understanding of the term "financial information." *Wash. Post. Co. v. United States Dep't of Health & Human Servs.*, 690 F.2d 252, 266 (D.C.Cir.1982). And the drafts were submitted to DOI by NES (Himmelstein Decl. ¶ 4), so they were, in fact, obtained from a person. *Nadler v. Fed. Deposit Ins. Corp.*, 92 F.3d 93, 95 ("person" includes corporations). The relevant issue, then, is whether the drafts are "privileged or confidential."

 To determine whether the information NES provided is privileged or confidential within the meaning of Exemption 4, it is necessary to decide whether the information was provided to the gov-

---

puterized search. (Newton Supp. Decl. ¶¶ 4–9, 15, 17.)

**17.** Plaintiffs have also requested discovery on the scope of defendants' search. (Pls.' Mot. at

41; Reply at 20.) Discovery is not favored in FOIA lawsuits, *Judicial Watch, Inc., v. United States Dep't of Justice*, 185 F.Supp.2d 54, 65 (D.D.C.2002), and this case does not merit an exception to this rule.

ernment voluntarily or if it was required to be provided. If it was voluntarily provided, the information is confidential if it is "of a kind that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d 871, 879 (D.C.Cir.1992) (*en banc*). If, however, the information was given involuntarily, it will not be considered confidential unless the submitter can show that disclosure will (1) "impair the government's ability to obtain necessary information in the future; or (2) cause substantial harm to the competitive position of the person from whom the information was obtained." *Nat'l Parks & Conservation Ass'n v. Morton,* 498 F.2d 765, 770 (D.C.Cir.1974). Moreover, the D.C. Circuit has explained that whether a submission is involuntary is determined based on an objective test—"actual legal authority, rather than parties' beliefs or intentions, governs judicial assessments of the character of submissions ... if an agency has no authority to enforce an information request, submissions are not mandatory." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.,* 244 F.3d 144, 149 (D.C.Cir.2001).

█ It is plaintiffs' position that the draft severance agreements were not voluntarily submitted to DOI. (Pls.' Mot. at 28–30; Pls.' Reply at 11–13.) They argue that, pursuant to the EIGA, "DOI had legal authority to require Griles to provide the severance payment agreement as a condition of approving his SF 278, and DOI exercised its authority." (Pls.' Reply at 12.) Defendants, on the other hand, argue that the information was voluntarily submitted because the EIGA only requires Mr. Griles to submit a *description* of the severance agreements. If that description is deemed to be insufficient, DOI can only require him to submit additional *information* by submitting a "more detailed description of the agreement's terms," and it

could not require NES to submit the draft agreements themselves. (Defs.' Reply at 9.) The issue, then, is whether DOI had "actual legal authority" to require submission of the drafts. After considering the relevant legal authority and upon an *in camera* review of the documents, the Court concludes that these documents were properly withheld under Exemption 4.

Under *Center for Auto Safety*'s objective test, NES' submission of draft agreements to DOI must be considered voluntary. The EIGA requires an agency official to review the periodic report of financial information (Form SF 278) submitted by certain officials, including Mr. Griles. 5 C.F.R. § 2634.605(a). Although the reviewing official "need not audit the report," 5 C.F.R. § 2634.605(b)(2) ("[d]isclosures shall be taken at 'face value' as correct, unless there is a patent omission or ambiguity or the official has independent knowledge of matters outside the report"), the statute gives an agency official authority to request any additional information necessary to clear up ambiguities or omissions in the report. 5 U.S.C.App. 4 § 106(b)(2) (if the agency official "believes additional information is required to be submitted, he shall notify the individual submitting such report what additional information is required and the time by which it must be submitted"); *see also* 5 C.F.R. § 2634.605(b)(3) ("If the reviewing official believes that additional information is required, he shall request that it be submitted by a specified date. This additional information shall be made a part of the report."). However, the ability to request information does not equate with the legal authority to compel the production of that information. Defendants contend that "if Department ethics officials had concluded that Mr. Griles' description of his severance agreement ...

was inadequate, the most they could have required him to do was to provide a more detailed description of the agreement's terms. But they would have had no actual legal authority to compel him to submit a copy of the severance agreement (or draft) itself." (Defs.' Reply at 9.) This argument is persuasive, especially given the fact that the documents at issue here are only drafts, for, even if plaintiffs' argument might apply to the final agreement (an issue the Court need not decide), it cannot be stretched to cover mere drafts. (*See* Simmons Decl. ¶ 27.) Moreover, nothing in the statute or regulations gives DOI the "authority to enforce an information request." *Ctr. for Auto Safety,* 244 F.3d at 149. Thus, the objective test set forth in *Center for Auto Safety* dictates that the submission of the draft severance agreements was voluntary.[18]

Because the documents were submitted voluntarily, they will be exempt from disclosure if defendants carry their burden of establishing that the documents are the kind of information that would not customarily be released to the public. *Ctr. for Auto Safety,* 244 F.3d at 147–48; *Critical Mass,* 975 F.2d at 879. In making this determination, the Court must consider NES's customary treatment of this information, rather than how the industry as a whole treats it. *Ctr. for Auto Safety,* 244 F.3d at 148. In this regard, defendants have submitted the declaration of Marc Himmelstein, President and founder of NES, Inc. He avers that NES considers severance agreements to be "proprietary financial information that it has never

made available to the public," and he could think of no other occasion when the company had disclosed such an agreement. (Himmelstein Decl. ¶ 3.) In fact, he agreed to turn the documents over only after DOI assured him that they would remain confidential. (*Id.* ¶ 4.) Based on this declaration, the Court concludes that defendants have established that Exemption 4 applies to these documents.

 The FOIA analysis does not end, though, with a determination that the documents are exempt from disclosure. The statute also requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). Purely factual information is generally considered non-deliberative, and is therefore not typically covered by the exemption. *See Army Times Publ'g Co. v. Dep't of the Air Force,* 998 F.2d 1067, 1071 (D.C.Cir.1993) ("Exemption 5 applies only to the deliberative portion of a document and not to any purely factual, non-exempt information the document contains. Non-exempt information must be disclosed if it is reasonably segregable from exempt portions of the record, and the agency bears the burden of showing that no such segregable information exists.") (internal citation and quotation marks omitted). Such information must be disclosed even when contained in an otherwise protected document, unless the factual material is "inextricably intertwined" with, or incapable of being segregated from, the exempt material. *Mead Data Cent., Inc. v. United*

18. This conclusion is unaffected by plaintiffs' references to the Inspector General's report. *See* Notice of Supplemental Authority at 2. The fact that DOI's Ethics Office reviewed these draft agreements, that they were " 'floated' with OGE" and that the drafts were cleared or approved by both the Ethics Office and OGE does not transform these draft doc-

uments into a legally compelled production. In the absence of evidence of any authority to require their production, the fact that Mr. Griles and NES sought ethics advice and approval regarding the drafting of Mr. Griles' severance agreement is not enough to satisfy the *Critical Mass* test for involuntariness.

*States Dep't of the Air Force,* 566 F.2d 242, 260 (D.C.Cir.1977) ("non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions"). Information is "inextricably intertwined" with exempt material if disclosure would leave "an essentially meaningless set of words and phrases," and in that case, the entire record may be withheld. *Mead Data,* 566 F.2d at 261. Plaintiffs argue that defendants failed to demonstrate that there was no reasonably segregable information in the withheld documents. (Pls.' Mot. at 34.) After an *in camera* review of the documents, the Court is satisfied that no additional factual information is reasonably segregable. *See Tarullo v. United States Dep't of Defense,* 170 F.Supp.2d 271, 278 (D.Conn.2001) (summary of facts was so intertwined with recommendations and opinions that production of a redacted version would be incomprehensible). Accordingly, the defendants' invocation of Exemption 4 will be upheld with respect to the draft severance agreements.[19]

### B. Exemption 5

■ Defendants have withheld the eight remaining documents,[20] which consist of inter-agency and intra-agency communications, under Exemption 5. Exemption 5 allows an agency to withhold memoranda or letters that would be protected from discovery in routine civil litigation. *See* 5 U.S.C. § 552(b)(5) (exempting "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency") ("Exemption 5"). This provision has been interpreted to incorporate the deliberative process privilege, which shields from disclosure documents that reflect or reveal the deliberations an agency engaged in prior to arriving at a particular decision. *See Tax Analysts v. Internal Revenue Serv.,* 294 F.3d 71, 76 (D.C.Cir.2002). Whether the deliberative process privilege applies is "dependent upon the individual document and the role it plays in the administrative process." *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 867 (D.C.Cir.1980). The critical question in this context is whether "disclosure of [the] materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Dudman Communications Corp. v. Dep't of the Air Force,* 815 F.2d 1565, 1568 (D.C.Cir.1987). To receive protection, therefore, the materials must be *both* predecisional and deliberative. *See Mapother v. Dep't of Justice,* 3 F.3d 1533, 1537 (D.C.Cir.1993).

■ Here, plaintiffs challenge defendants' withholding of several inter-agency and intra-agency documents generated after OGE asked DOI to look into possible ethics violations by Mr. Griles. The first six documents comprise a series of inter-agency letters between DOI and OGE, including a June 20, 2002 OGE letter prompted by the May 25, 2002 *Washington Post* article about Mr. Griles' contact with EPA regarding coalbed methane mining in Wyoming, and asking DOI to look into whether Mr. Griles violated conflict of interest rules (DOI *Vaughn* No. 43; OGE *Vaughn* No. 9); DOI's September 10, 2002

---

**19.** Given the Court's resolution of defendants' claim under Exemption 4, it need not reach defendants' alternative argument that the documents are also covered by Exemption 6.

**20.** The documents are identified on the agencies' *Vaughn* indexes as numbers DOI 43/ OGE 9, DOI 46/OGE 10, OGE 11, OGE 12, DOI 37, and DOI 38. It appears that documents numbered DOI 43 and OGE 9 are copies of the same inter-agency document, as are DOI 46 and OGE 10.

response to this letter (DOI *Vaughn* No. 46; OGE *Vaughn* No. 10); DOI's November 29, 2002 response to OGE's oral follow-up questions (OGE *Vaughn* No. 11); and OGE's December 20, 2002 response to DOI's analysis (DOI *Vaughn* No. 12). With the guiding principles set forth above in mind, the Court has reviewed these documents *in camera* and determined that they constitute "inter-agency ... memorandums or letters" protected by Exemption 5. 5 U.S.C. § 552(b)(5).

Plaintiffs contend that DOI's responses to OGE's inquiries constitute final agency determinations by DOI, rather than pre-decisional or deliberative documents. (Pls.' Reply at 16.) This position overlooks the fact that Exemption 5 expressly encompasses inter-agency, as well as intra-agency documents, and it misconstrues the way ethics decisions are reached by the OGE in conjunction with an agency. "By including inter-agency memoranda in Exemption 5, Congress plainly intended to permit one agency possessing decisional authority to obtain written recommendations and advice from a separate agency not possessing such decisional authority" without requiring the advising agency's advice to be disclosed. *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 188, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975).

Here, although OGE relies upon agencies to conduct inquiries into ethics violations and to report their findings, OGE is ultimately responsible for making a determination whether an agency official has complied with relevant ethics requirements. (Glynn Decl. ¶¶ 9, 15.) Plaintiffs are correct that agency ethics officials, not the OGE, are responsible for implementing an agency's ethics program and remedying any violations. 5 C.F.R. § 2638.203(b)(9)(i), (iv); *id.* § 2638.501(a). Given its limited resources, the OGE relies upon the agencies to perform these functions, but the results of the agency's investigations and its own conclusions about whether ethics violations actually occurred are not the final word if the OGE finds that more needs to be done.

> Although agencies may reach their own conclusions about the matter after completing their inquiry, their findings, analyses and conclusions as reported to OGE remain part of the deliberative process because, under the Ethics Act, OGE as the supervising ethics office for the executive branch [ ] makes a determination concerning whether an agency official has complied with his or her ethics agreement and the regulatory ethics requirements.

(Glynn Decl. ¶ 15; *see also id.* ¶ 8 (when questions remain, "OGE may continue to query the agency regarding various facts as well as their analysis, until OGE is satisfied that the ethics agreement has been complied with and that no violations of the ethics laws and regulations have occurred").) [21] This is consistent with stat-

---

21. A statement in OGE's March 12, 2004 determination letter is not to the contrary. *See* attachments to Plaintiffs' Notice of Supplemental Authority. There, OGE notes that "DOI, as the employing agency, is primarily responsible for determining whether the conduct of its employees violates the Standards of Ethical Conduct .... Our role in reviewing your report is to provide consultation and advice to DOI on how the rules and law apply to the facts presented." (Letter from Marilyn Glynn, Acting Director, Office of Government Ethics, to Earl Devaney, Inspector General, DOI (March 12, 2004) ["OGE Letter"].) "Such assistance and advice is critical to OGE's ability to properly review such matters, given its limited resources and the closer proximity of agency ethics officials to the facts and circumstances of the situation." (Glynn Decl. ¶ 15.) This does not undermine the fact that it is OGE's responsibility to determine whether an inquiry is complete and whether any ethics violations have in fact occurred.

utory and regulatory authority. The Ethics Act gives the OGE responsibility for ethics decisions within the Executive Branch. 5 U.S.C.App. § 402(f)(2)(A)(ii) (the OGE Director may recommend that an agency investigate possible ethics violations); *id.* § 402(f)(2)(A)(iii) (the OGE Director may order specific actions to end violations); 5 C.F.R. § 2638.102(a) (The OGE "provides overall direction and leadership concerning executive branch policies related to preventing conflicts of interest"); *id.* § 2638.504(b) (the OGE Director may initiate an investigation to determine whether a violation has occurred and "[o]rdinarily a determination to proceed will be *based upon* an agency report of investigation" (emphasis added)); *id.* § 2638.504(e) (OGE's Director "will make a written finding as to whether a violation of any ethics provision has occurred").

Furthermore, based on an *in camera* review of the withheld documents and a review of DOI OIG's report and OGE's March 12, 2004 opinion letter, it is apparent that the withheld documents were in fact predecisional and part of a deliberative process. OGE, the agency responsible for an ultimate determination about ethics questions concerning Mr. Griles, requested that DOI assess whether Mr. Griles violated any ethics laws (DOI *Vaughn* No. 43; OGE *Vaughn* No. 9), and DOI responded to this and other follow-up questions, describing its inquiries and conclusions. (DOI *Vaughn* No. 46; OGE *Vaughn* Nos. 10, 11). Even though DOI's letters contained its analyses and conclusions about whether certain ethics violations had occurred, the inquiry did not end there. The OGE replied, noting additional issues that remained to be determined and asking the DOI to investigate further. (DOI *Vaughn* No. 12.) To answer these subsequent questions, as well as to address other possible ethics violations, the DOI OIG conducted an investigation, ultimately issuing a report, which was publicly released on

March 16, 2004. (*See* DOI Office of Inspector General, J. Steven Griles Report of Investigation (2004) ["OIG Report"].) Notably, the report made factual findings but did not reach a conclusion as to whether Mr. Griles violated ethics laws or his recusals. In response, OGE offered its analysis of the report, and concluded that no violations had occurred. (OGE Letter.) Thus, even though DOI conducted its investigation and analysis, which played a critical role in determining whether an ethical investigation occurred (Glynn Decl. ¶ 9 ("Both OGE and the agency play a critical role in reviewing the facts and the law")), the decision was not, in effect, finalized until OGE indicated that it was satisfied that no violations had occurred. Further, DOI's documents are a "direct part of the deliberative process" in that they "make[ ] recommendations or express opinions on legal ... matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C.Cir.1975) ("*Vaughn II* ").

Plaintiffs' citation to *Evans v. United States Office of Personnel Mgmt.*, 276 F.Supp.2d 34, 40–41 (D.D.C.2003), does not prove the contrary. (Pls.' Mot. at 38.) In *Evans*, the withheld document consisted of "a clear statement of [the agency's] legal position on a policy." *Id.* at 40. It was not predecisional or deliberative, as it memorialized a final policy decision that was meant to guide later programmatic decisions. *Id.* (the document was not "shielded from disclosure by the deliberative process privilege merely because it was issued before a programmatic decision based on that legal opinion was finalized"). The DOI letters, in contrast, did not constitute final decisions just waiting to be implemented—the OGE had the authority to disagree with the conclusions contained therein, and it did so. Thus, DOI's analyses and conclusions are not, as plaintiffs contend, "horizontal communications between two agencies on a par with each other." (Pls.' Mot. at 38.) Instead, OGE,

in effect, overrode DOI's initial conclusions, and OGE made further inquiries in order to conclude its investigation. Unlike *Evans*, then, the documents at issue here were both predecisional and deliberative.[22] Accordingly, disclosure of the documents exchanged between DOI and OGE would expose the decision-making process OGE initiated and directed in such a way as to discourage candid communication in the future between OGE and agencies. (Glynn Decl. ¶¶ 9–12 (OGE must rely on agencies to discover any relevant facts, and the "quality and efficiency of this process would be severely eroded and undermined if any part of these discussions were disclosed").) This would thereby undermine OGE's ability to perform its functions. *Dudman*, 815 F.2d at 1568. Therefore, the documents fall under Exemption 5's deliberative process privilege. *Grumman*, 421 U.S. at 188, 95 S.Ct. 1491.

 Moreover, the fact that the OIG's report mentioned several withheld documents does not render those documents subject to disclosure. Specifically, the report mentions and, in some cases, selectively quotes from all four withheld interagency documents. (*See, e.g.*, OIG Report at 58–59, 65.) A document can lose its exempt status if it is "adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States*, 617 F.2d at 866; *see also Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 161, 95 S.Ct. 1504, 44 L.Ed.2d 29

(1975) (a document loses its exemption if it is "expressly ... adopt[ed] or incorporat[ed] by reference" in a final opinion). Here, the DOI documents were not informally or expressly adopted as the agency's position, as the OGE, in its December 20, 2002 letter, disagreed with DOI's analysis. Likewise, OGE's final opinion did not adopt any analysis or conclusion from its request letter of June 20, 2002. And none of these documents was actually used in either agency's dealings with the public.

 The December 20, 2002 OGE letter poses a closer question. The OGE final opinion references that letter's conclusion that the entire Powder River project might fall under the definition "particular matter," and as such, might be the basis of a conflict of interest if Mr. Griles participated in decisions involving it.[23] (OGE Letter at 4.) The OGE did not expressly adopt the December 20 letter's reasoning as to this finding. Instead, it noted its earlier conclusion, and found that, after reviewing the OIG report, it continued to believe that the project met the "particular matter" definition. (*Id.*) "[W]here it is unclear whether a recommendation provided the basis" for the agency's decision, "the recommendation is exempt from disclosure." *Trans Union*, 141 F.Supp.2d at 70–71. Because it is unclear whether, after considering the fuller factual picture provided by the OIG's report, the OGE was adopting its earlier reasoning as the basis for its final decision or was just noting its preliminary conclu-

---

22. Plaintiffs note that the documents are not from an agency subordinate to a superior. (Pls.' Mot. at 38.) While such a vertically-moving document is the "classic case of the deliberative process at work" and is usually protected by Exemption 5, *Evans*, 276 F.Supp.2d at 40–41 (quoting *Murphy v. Dep't of the Army*, 613 F.2d 1151, 1154 (D.C.Cir. 1979)), the fact that the documents at issue here do not fit this mold is not dispositive. *Coastal States*, 617 F.2d at 866 ("[t]he privi-

lege has a number of purposes," *one* of which is "to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public fear or criticism").

23. 18 U.S.C. § 208 subjects a government official to penalties for participating in a "particular matter in which, to his knowledge, he ... has a financial interest."

sion, the document is exempt from disclosure. *Grumman,* 421 U.S. at 184–85, 95 S.Ct. 1491 ("because the evidence utterly fails to support the conclusion" that the reasoning in reports issued by Regional Boards as to whether a government contractor received excessive profits "is adopted by the Board as its reasoning, even when it agrees with the conclusion of a report, we conclude that the reports are not final opinions and do not fall within Exemption 5"). This is precisely the type of preliminary document that must be exempt to "protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's actions," *Coastal States,* 617 F.2d at 866, and thus, the December 20, 2002 letter is also protected by Exemption 5.

■ After an *in camera* review of each of the documents, the Court is satisfied, with one exception, that no additional factual information is reasonably segregable. *Tarullo,* 170 F.Supp.2d at 278. The one document that must be released is an attachment to the November 29, 2002 DOI letter (OGE *Vaughn* No. 11). Attachment 1 consists of a draft Wyoming Coal Bed Methane EIS. This document has been publicly released, and thus it is not exempt

from disclosure. *Virginia Beach v. United States Dep't of Commerce,* 995 F.2d 1247, 1253 (4th Cir.1993).

■ The remaining two withheld documents consist of e-mails and their attachments, exchanged between Shayla Simmons and Arthur Gary, that contain proposed revisions to a draft memorandum to Mr. Griles incorporating DOI's findings and recommendations regarding his EPA contact. (OGE Vaughn Nos. 37, 38.) These intra-agency documents are clearly deliberative as they involve the "give-and-take of the consultative process" among DOI ethics officials concerning a determination about ethics issues regarding Mr. Griles' conduct. *Access Reports v. Dep't of Justice,* 926 F.2d 1192, 1195 (D.C.Cir.1991). The record does not reflect that these documents were expressly adopted by OGE. Even though Ms. Simmons gave a vague indication that some of her recommendations were adopted by her superiors (Simmons Supp. Decl. ¶ 16), her superiors are at DOI. The Court has already held that DOI's conclusions and opinions fall within the deliberative process privilege. As such, these e-mails and their attachments are exempt. After *in camera* review, the Court is also satisfied that they do not contain segregable information. *Mead Data Cent.,* 566 F.2d at 260.[24]

---

24. Plaintiffs also ask the Court to make a written finding that the circumstances surrounding defendants' withholding of documents raise questions whether they acted arbitrarily or capriciously. *See* 5 U.S.C. § 552(a)(4)(F) (providing that where a court orders production of an improperly withheld document, awards attorneys' fees and costs to the plaintiff, and makes a written finding that "the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding," a Special Counsel shall initiate an investigation to determine whether disciplinary proceedings are warranted). They claim defendants "effectively stonewalled" their FOIA request by failing to undertake an adequate search and withholding responsive documents. (Pls.' Mot. at 41.) However, defendants have offered extensive affidavits that explain their response to plaintiff's FOIA requests. Although the Court will order disclosure of one withheld document, plaintiffs have failed to point to evidence in the record that defendants acted arbitrarily or capriciously. If plaintiffs' allegations were sufficient, any time a defendant conducted an inadequate search or was required to turn over previously withheld documents, a written finding under § 552(a)(4)(F) would be warranted. The Court is unwilling to adopt that approach.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment and plaintiffs' cross-motion for partial summary judgment will each be granted in part and denied in part. Summary judgment will be entered for defendants on their withholding of documents under Exemptions 4 and 5, except as to an attachment to the document identified as OGE *Vaughn* No. 11, which defendants will be required to turn over to plaintiffs. However, defendants will be required to refer plaintiffs' FOIA request to the Solicitor's Office and the Office of the Inspector General. They are also required to provide a further response regarding DOI's failure to locate six documents. Plaintiffs' request for a written finding under 5 U.S.C. § 552(a)(4)(F) that defendants' withholding raises questions of arbitrary and capricious action will be denied. Counts III and IV will be dismissed.

## ORDER

Upon consideration of the pleadings and the entire record herein and for the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Claims III and IV will be dismissed and defendants' motion to dismiss these claims [# 14] is **DENIED** as moot; and it is

**FURTHER ORDERED** that defendants' motion for summary judgment [# 14] and plaintiffs' motion cross-motion for partial summary judgment [# 18] are **DENIED** in part and **GRANTED** in part; and it is

**FURTHER ORDERED** that defendants' motion for summary judgment on the grounds that the draft severance agreements they withheld are protected from disclosure by 5 U.S.C. § 552(b)(4) is **GRANTED**, and it is

**FURTHER ORDERED** that defendants' motion for summary judgment on the grounds the inter-agency and intra-agency agreements they withheld are protected from disclosure by 5 U.S.C. § 552(b)(5) is **GRANTED**, except that Attachment 1 of the document labeled OGE *Vaughn* No. 11 must be produced; and it is

**FURTHER ORDERED** that defendants shall refer plaintiffs' request to the Offices of the Solicitor and Inspector General forthwith; and it is

**FURTHER ORDERED** that defendants shall, within forty-five (45) days of the date of this Order, provide a further explanation as to why certain documents identified by OGE were not produced by DOI; and it is

**FURTHER ORDERED** that plaintiffs' request for a written finding under 5 U.S.C. § 552(a)(4)(F) that the circumstances surrounding defendants' withholding raises concerns of arbitrary or capricious actions is **DENIED**.

**IT IS SO ORDERED.**